**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 21 2000**

**PATRICK FISHER**
**Clerk**

EDWARD TYLER,

      Plaintiff-Appellee,

v.

RE/MAX MOUNTAIN STATES, INC.,

      Defendant-Appellant.

No. 99-1421

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 96-WY-734-AJ)**

---

Todd J. McNamara (Kristina James with him on the brief) of Todd J. McNamara, P.C., Denver, Colorado, for Plaintiff-Appellee.

Andrew M. Low (Thomas P. Johnson and Victoria V. Johnson with him on the briefs) of Davis, Graham & Stubbs LLP, Denver, Colorado, for Defendant-Appellant.

---

Before **BRORBY, McWILLIAMS** and **KELLY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

This case requires us to review the trial court's denial of defendant's

motion for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b), after an adverse jury verdict. The jury found RE/MAX intentionally discriminated against Mr. Tyler on the basis of race by denying his franchise application, in violation of 42 U.S.C. § 1981 and the Federal Housing Act, 42 U.S.C. § 3601. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.[1]

## FACTUAL BACKGROUND

Mr. Tyler is an African American real estate agent and broker. Since 1991, he has owned and operated his own real estate practice ("Cheyenne Springs Realty") south of Colorado Springs. At all times relevant to this appeal, his real estate practice included a furnished office, office equipment, one or more licensed sales agents, and an administrative assistant.

The chain of events leading up to this litigation began in 1992, at a Colorado Association of Realtors convention, when a RE/MAX representative informed Mr. Tyler the normal franchise fee was reduced to $10,000 in an effort to increase the company's market share. In 1993, Mr. Tyler became interested in

---

[1] We grant RE/MAX's unopposed motion to file its supplemental appendix.

securing a RE/MAX franchise in the same area as his current real estate practice. In September of that year, he completed and submitted to RE/MAX his personal history form, income statement, and statement of financial condition. The personal history form sought information on each applicant's educational and business background, the number of sales associates employed, and the number of listings and sales closed in the last year. Mr. Tyler's income statement showed a net profit (income minus expenses) equaling $62,858.81. His statement of financial condition listed his business, personal, and total net worth. The final column calculated the "owner's [total] net worth" as $194,372.26.

After submitting these documents, Mr. Tyler contacted Ms. Bond, the Regional Director of RE/MAX Mountain States, to set an appointment to discuss his franchise application. During his visit to the corporate offices, he informed Ms. Bond of two IRS tax liens filed against him, but, he explained, the liens had been paid. Mr. Tyler testified at trial that he forwarded the tax lien releases to her in November.

In the spring of 1994, Mr. Tyler compiled a lengthy document for a Small Business Association loan titled "RE/MAX Franchise, Preliminary Purchase Proposal, Phase I" ("Phase I Proposal"). The Phase I Proposal detailed his

operating plan, financial statements, and sales and census information for his current practice and prospective franchise. In his operating plan, Mr. Tyler graphed his 1992 residential sales in excess of $3.1 million, and his commercial sales at $95,000, with a total of $142,626 in commission. In 1993, his residential sales increased to over $3.5 million, while his commercial sales rose to $770,000, with $170,062 in commission. Most notable for this litigation, the Phase I Proposal included financial statements for the 1993 calendar year. The balance sheet for Cheyenne Springs Realty listed the business' "net worth" as negative $10,419.95. The actual "income and expense" statement showed a loss of $5,932.45.

In April 1994, Ms. Bond visited Mr. Tyler's Cheyenne Springs Realty office. Mr. Tyler testified at trial that during her visit, Ms. Bond did not ask about the releases on his tax liens, the number of agents on staff, the number of sales he had in the first quarter of 1994, or suggest there were any abnormalities in his business financial statements. The two did not speak to each other again until May.

In early May 1994, Ms. Bond telephoned Mr. Tyler to inform him his franchise application was denied. He requested her reasons for the rejection.

Days after the telephone call, he sent Ms. Bond a letter which listed the four reasons she had allegedly given, refuted each in detail, and requested reconsideration of his application. More than two months later, Ms. Bond penned her own letter articulating seven reasons for the rejection.

Mr. Tyler sued RE/MAX for intentional racial discrimination, in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 3601. The trial court denied RE/MAX's motion for summary judgment, and the case proceeded to trial. (App. Vol. I at 6.) RE/MAX raised its motion for judgment as a matter of law at the close of the plaintiff's case and again at the close of all the evidence. The jury found in favor of Mr. Tyler, and awarded him damages.[2] RE/MAX renewed its motion for judgment as a matter of law or in the alternative a new trial, after the entry of judgment; the trial court denied the motion.

## STANDARD OF REVIEW

We review the district court's denial of a Rule 50(b) motion for judgment as a matter of law *de novo*, applying the same legal standard as the district court. *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232,1241 (10th Cir. 1999). We shall

---

[2] RE/MAX does not appeal the jury verdict finding a violation of 42 U.S.C. § 3601.

review all the evidence in the record, construe the evidence and inferences most favorably to the nonmoving party, and refrain from making credibility determinations and weighing evidence. *Reeves v. Sanderson Plumbing Prod., Inc.*, 120 S. Ct. 2097, 2110 (2000); *see also Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000). Judgment as a matter of law is appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Finley v. United States,* 82 F.3d 966, 968 (10th Cir. 1997) (quotation marks and citation omitted)*.* Applying this standard of review, we must determine whether the district court erred in denying RE/MAX's motion for judgment as a matter of law after a trial on the merits.

## DISCUSSION

42 U.S.C. §1981 ensures, among other rights, that persons of all races shall have equal rights to make and enforce contracts. A § 1981 plaintiff alleging racial discrimination may prove intentional discrimination through either direct or circumstantial evidence. *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Mr. Tyler presented no direct evidence, and thus, our review is limited to indirect evidence of discrimination.

Our approach in this context is governed by our analysis in *Stewart v. Adolph Coors Co.,* 217 F.3d 1285, 1288 (10th Cir. 2000). Specifically, in our review of the sufficiency of the evidence to support the jury's verdict, we assume Mr. Tyler met his burden of proving a prima facie § 1981 claim, and the claim properly went to trial. *See id.* After a full trial on the merits, "'the sequential analytical model adopted from McDonnell Douglas ... drops out and we are left with the single overarching issue whether plaintiff adduced sufficient evidence to warrant a jury's determination that adverse employment action was taken against' the plaintiff" based on his race. *Kendrick*, 220 F.3d at 1226 (quoting *Fallis v. Kerr-McGee Corp.,* 944 F.2d 743, 744 (10th Cir. 1991)); *see also Reeves*, 120 S. Ct. at 2106. In other words, after a verdict on the merits, the "burden shifting framework of McDonnell Douglas is largely irrelevant and the issue is whether the adverse employment action was motivated by race."[3] *Stewart,* 217 F.3d at 1288 (citing *Sanchez*, 992 F.2d at 246).

The burden of persuasion is at all times borne by the plaintiff. *Reeves*, 120 S. Ct. at 2106. The *Reeves* case explained a plaintiff can meet the burden of persuasion through a combination of a *prima facie* case and "'sufficient evidence

---

[3] RE/MAX concedes the McDonnell Douglas burden-shifting analysis is no longer relevant after a full trial on the merits.

to find that the employer's asserted justification is false.'" *Stewart,* 217 F.3d at 1288 (quoting *Reeves*, 120 S. Ct. at 2108). Having assumed the *prima facie* case was shown, we review the record to determine whether Mr. Tyler presented sufficient evidence to show RE/MAX's asserted justifications were pretextual.[4] *Stewart,* 217 F.3d at 1288.

Mr. Tyler wrote a letter to Ms. Bond just days after he learned over the telephone his application was denied. At trial, he presented the letter and testified Ms. Bond listed four reasons for the rejection: (1) lack of market share; (2) RE/MAX already has five percent market share in the area; (3) no qualified

---

[4] RE/MAX raises one issue on appeal: "[D]id Tyler fail to present evidence from which a jury would be permitted to conclude that RE/MAX's decision not to sell Tyler a franchise was based on Tyler's race?" RE/MAX categorizes Mr. Tyler's evidence into three categories: statistical, comparative, and circumstantial evidence of pretext. We are in no way obligated to accept RE/MAX's characterization of Mr. Tyler's evidence. Moreover, as we stated in *Stewart*, our inquiry after a trial on the merits is whether there was sufficient evidence presented for the jury to infer RE/MAX's reasons were pretextual. 217 F.3d at 1288. RE/MAX did not list as one of its justifications Mr. Tyler's lack of qualifications compared to the other successful franchisees. Instead, RE/MAX documented Mr. Tyler's lack of financial resources, staff, and real estate sales, standing alone, as the reasons his application was turned down. *Cf. Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 245 (10th Cir. 1993) (employer's justification for not hiring plaintiff was he "was not the best qualified" of the applicants). RE/MAX's request that we review the "statistical" and "comparative" evidence amounts to an attempt by RE/MAX to "retry" the prima facie case contrary to established precedent. For the reasons stated, we focus our review on evidence of pretext.

agents on staff; and (4) he was not currently working for a RE/MAX franchise.

Two months later, on July 11, 1994, Ms. Bond wrote a response letter listing her reasons for the rejection. She admits, "[a]lthough it is not our practice to respond in writing to franchise prospects regarding acceptance or denial, we are responding to your request for a written response." She wrote, at the conclusion of her letter, "We have not addressed a number of the areas you brought up in your May 9, 1994 correspondence. Much of the information cited in your letter is not correct." She listed seven justifications for denying Mr. Tyler's application, under the two main headings "credit/financial resources" and "conversion criteria". On appeal, RE/MAX argues Mr. Tyler failed to show five of Ms. Bond's reasons were pretextual:[5] (1) negative net worth on balance sheet; (2) "losses of income reflected on the income statement"; (3) market share; (4) sales volume; and (5) lack of sales associates.[6]

---

[5] RE/MAX admitted Mr. Tyler presented sufficient evidence from which the jury could infer pretext for two of its seven justifications.

[6] Ms. Bond testified at trial that an additional reason for Mr. Tyler's rejection was his "subpar" office. The jury could reasonably conclude this was a post hoc justification. *See Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991) ("If at the time of the adverse employment decision the decision maker gave one reason, but at the time of trial gave another reason which was unsupported by the documentary evidence the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification."), *cert. denied*, 505 U.S. 1205 (1992).

This presents an unusual situation because both parties have presented documentary evidence of RE/MAX's justifications. We are hesitant to allow an employee (or applicant) to frame the employer's (or franchisor's) justifications by merely sending a letter contemporaneous with the adverse employment action. *See Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."). We are disquieted, however, by an employer who "fully" articulates its reasons for the first time months after the decision was made. Because it does not alter our decision, we will review whether Mr. Tyler presented sufficient evidence to find the reasons, as characterized by RE/MAX, were pretextual.

We are mindful we must not sit as a super-personnel department that second-guesses the company's business decisions, with the benefit of twenty-twenty hindsight, when reviewing whether the employer's reasons were pretextual. *See Kendrick,* 220 F.3d at 1233. However, "[e]vidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination." *Fishbach v. District of Columbia Dep't. of Corr.,* 86 F.3d 1180, 1183 (D.C. Cir. 1996). "'The factfinder's disbelief of the reasons put forward by

-10-

the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.'" *Reeves,* 120 S. Ct. at 2108 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

To begin, we are called upon to decide whether a plaintiff must present sufficient evidence to reject each of the employer's multiple reasons for its adverse employment action. RE/MAX argues Mr. Tyler must demonstrate all its reasons for rejecting Mr. Tyler's franchise application are pretextual. We agree, as a general rule, an employee must proffer evidence that shows each of the employer's justifications are pretextual. *See Wilson v. AM General Corp.,* 167 F.3d 1114, 1120 (7th Cir. 1999) ("Generally the employee has the burden of demonstrating that each proffered nondiscriminatory reason is pretextual."); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1539, 1543 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998). However, like other circuits, we are unwilling to apply that rule as rigidly as RE/MAX would like, recognizing that when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility. *See Chapman*, 229 F.3d at 1049-51 (Birch, J., concurring in part and dissenting in part) (discussing cases from the Third, Sixth, and Seventh circuits). Under those

circumstances, the jury need not believe the employer's remaining reasons. "This is but common sense: if a person is shown to be a liar in an outrageous manner or is shown to have lied about a number of issues, the inference that the person is non-credible, and should not be believed as to other issues, is a reasonable one." *Id.* at 1050. Stated differently, "'[t]here may be cases in which the multiple grounds offered by the defendant ... are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff may [prevail].'" *Wilson*, 167 F.3d at 1120 (quoting *Russell v. Acme-Evans Co.,* 51 F.3d 64, 70 (7th Cir. 1995)); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1998) ("[a]n employer's strategy of simply tossing out a number of reasons. . . in the hope that one of them will 'stick' could easily backfire.... [A] multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the 'honest belief' rule is inappropriate." (quotation marks and citations omitted)).

Turning to RE/MAX's proffered reasons, we have carefully reviewed the record and hold that Mr. Tyler satisfied the requirements of the rule by establishing sufficient grounds on which the jury could reasonably infer pretext.

*Negative net worth on balance sheet:*

RE/MAX demonstrated Mr. Tyler posted his "net worth" at negative $10,419.95 on his Cheyenne Springs Realty business balance sheet. Mr. Tyler included this business balance sheet in his Phase I Proposal, which he voluntarily submitted to RE/MAX as a supplement to his franchise application. Mr. Tyler, however, presented evidence that his 1993 "Statement of Financial Condition," included with his original franchise application, listed his combined business and personal "net worth" at $194,372.26. In April 1994, Ms. Bond apparently understood Mr. Tyler had a positive total net worth because she indicated that RE/MAX wanted Mr. Tyler to contribute $35,000 of his personal assets if he was awarded a franchise. Furthermore, there was no evidence Ms. Bond expressed any concern about Mr. Tyler's net worth in her communications with Mr. Tyler. If she had expressed concern, Mr. Tyler testified he would have explained to her the negative net worth indicated in the Phase I proposal failed to take into account his personal net worth. Construing this evidence in Mr. Tyler's favor, as we must, we hold the jury could reasonably infer: (1) Ms. Bond understood "net worth" to reflect both personal and business assets, and (2) in attempting to justify the decision to deny Mr. Tyler's application Ms. Bond disingenuously disregarded Mr. Tyler's personal net worth as documented in his original application. Mr. Tyler, therefore, presented sufficient evidence upon which the jury could reasonably conclude RE/MAX's first reason was pretextual.

*No market share*:

Ms. Bond's July letter to Mr. Tyler was silent on the time frame in which she believed Mr. Tyler had no market share or real estate sales. RE/MAX now contends Mr. Tyler had no sales in the first quarter of 1994, based on Ms. Bond's testimony she perused a "sold list" she obtained from the Colorado Springs Multi-List.

The parties dispute whether Ms. Bond even inquired about his alleged lack of market share. Ms. Bond testified she expressed her concern to Mr. Tyler about his lack of market share during their April meeting, but Mr. Tyler's only response was he was too busy with the proposed franchise. Mr. Tyler testified Ms. Bond never asked him whether he had any sales in 1994, even though logically he was the person with the most current sales information. According to Mr. Tyler, Ms. Bond never expressed her concern about market share until after RE/MAX rejected his application. It is well within the jury's prerogative to reject Ms. Bonds' testimony and instead reasonably infer Mr. Tyler would have provided the market sales information if Ms. Bond had asked.[7]

---

[7] Mr. Tyler documented over $300,000 worth of real estate closings during the first quarter of 1994. He did not supplement his application with those documents, however, because, according to Mr. Tyler, Ms. Bond did not ask him about his 1994 sales.

Mr. Tyler presented evidence Ms. Bond was aware he recorded over two million dollars in sales for 1992, and four million dollars in sales for 1993. Moreover, Ms. Bond admitted it is plausible a person can consummate a real estate sale during the first quarter, but not the have the sale recorded in the Multi-List "sold list" until the second quarter. We conclude the combination of Ms. Bond's knowledge of Mr. Tyler's sales in 1992 and 1993, her failure to inquire about any 1994 sales, her lack of specificity in narrowing her concern over sales to 1994, and the conceded imperfection of the evidence she purportedly relied on, provide ample support for the jury to find her proffered reason unworthy of credence.

*No sales volume:*

RE/MAX concedes the analysis of this proffered justification is "identical to the analysis of the market share point." The evidence sufficient to prove this reason is essentially the same as that set forth to undermine the "lack of market share" reason; thus, no independent evaluation is required. Mr. Tyler prevails on this point as well.

*Lack of Sales Associates:*

The evidence is undisputed RE/MAX did not require an applicant to have a

minimum number of agents before opening a franchise.[8] After opening a

franchise in the Colorado Springs area, however, RE/MAX required a sales

associate quota of at least seven associates after one year, fifteen after two years,

and twenty by the end of the third year. Mr. Tyler's personal history form

submitted with his application stated he had two full time sales associates. Mr.

Tyler was a broker and agent, and his daughter, who worked for him, was a

licensed agent. He also had a part-time agent. Based on this evidence, the jury

could reasonably reject Ms. Bond's concern over lack of sales associates as a

pretextual justification for rejecting Mr. Tyler's franchise application.

"*Losses of income reflected on the income sheet*":

Ms. Bond's letter to Mr. Tyler in July 1994 summarily indicated Mr. Tyler

had losses "on the income sheet" as a reason for RE/MAX's denial of Mr. Tyler's

application. Ms. Bond did not identify which "income sheet" she relied on, and

further failed to define the time frame in which Mr. Tyler allegedly suffered a

loss. We assume she was referring to the document in the supplemental Phase I

Proposal titled "Income and Expenses -Actual," which showed a "net income

---

[8] Mr. Tyler presented evidence the Coopers, who RE/MAX admitted were similarly situated applicants, had no real estate agents on staff at the time they applied, but were granted a franchise.

(loss)" to Cheyenne Springs Realty of $5,932.45 in 1993.

Mr. Tyler's "Statement of Income" submitted with his September 1993 application listed his business income as exceeding $156,000, with expenses less than $94,000. He showed his business made a net profit of $62,858.81 through August 1993. Mr. Tyler explained to the jury Ms. Bond never indicated any concern about Mr. Tyler's potential loss during her April visit or her May telephone call. Mr. Tyler again testified that if he had been asked about the $5,932.45 loss, he would have explained the statement showed a "loss" because his accountant mistakenly treated Mr. Tyler's commission as an "expense" rather than a "draw." Because we draw all reasonable inferences in favor of the nonmoving party, we find Mr. Tyler presented sufficient evidence for the jury to disbelieve Ms. Bond's belated rationale that RE/MAX rejected Mr. Tyler's franchise application because he had a loss. Our holding is further fortified by our conclusions the jury could reasonably infer all RE/MAX's previous justifications were pretextual. If the jury found, as a whole, Ms. Bond was not credible, its decision to reject her proffered reason Mr. Tyler had "losses of income" is, likewise, reasonable. *See Chapman*, 229 F.3d at 1050.

CONCLUSION

For the reasons stated, we are not convinced the evidence points but one way, and is susceptible to no reasonable inferences supporting Mr. Tyler's claim. *Finley,* 82 F.3d at 968. We therefore hold Mr. Tyler presented sufficient evidence Ms. Bond's reasons for rejecting his franchise application were pretextual, thus permitting the jury to reasonably infer RE/MAX intentionally discriminated against him on the basis of race, in violation of 42 U.S.C. §1981. We **AFFIRM** the district court's denial of RE/MAX's motion for judgment as a matter of law.