**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 27 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

HEATHER L. ALWINE,

      Plaintiff-Appellant,

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

v.

JOSEPH J. BUZAS; BUZAS
BASEBALL, INC., doing business
as Salt Lake Buzz Baseball Team,
a Utah corporation; MINNESOTA
TWINS, a Minnesota partnership,

      Defendants-Appellees.

No. 02-4185
(D.C. No. 2:99-CV-245-TC)
(D. Utah)

---

**ORDER AND JUDGMENT** *

---

Before **O'BRIEN** and **BALDOCK** , Circuit Judges, and **BRORBY** , Senior Circuit
Judge.

---

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination

---

*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

Plaintiff Heather L. Alwine brought this sexual discrimination action, charging that defendant Joseph J. Buzas, owner of the Salt Lake Buzz baseball team (Buzz), had sexually harassed her during interviews for a general manager position with the Buzz. [1]  After a jury found for the defendants on each of her claims, Ms. Alwine filed a renewed motion for judgment as a matter of law, or alternatively, for a new trial.  The district court denied her motions, and she now appeals.

Ms. Alwine contends that the district court made rulings during the trial that placed her case in a false light and thereby impermissibly skewed the jury's verdict.  She asks us to consider: (1) whether the district court improperly restricted her from advancing a theory that Mr. Buzas' actions created a hostile work environment; (2) whether this restriction led to the exclusion of directly relevant evidence and to the use of improper jury instructions; (3) whether

---

[1]    She asserted eight causes of action against defendants Buzz and/or Buzas, including Title VII sexual harassment and retaliation claims; a claim for violation of the Fair Labor Standards Act (FLSA); and state law claims for invasion of privacy, interference with prospective economic relations, negligent supervision, intentional infliction of emotional distress, and defamation.  Alwine dismissed the defamation claim prior to trial, and the district court granted judgment as a matter of law to defendants on the FLSA claim.  The remaining claims were presented to the jury.

defense counsel presented improper closing argument so egregious as to require a new trial; (4) whether the jury should have been permitted to consider evidence from non-decision-makers about the Buzz's reasons for not hiring her; and (5) whether the district court presented improper jury instructions on a mixed motive defense. Because we conclude that none of the alleged errors requires reversal of the judgment entered in favor of defendants on the jury's verdict, or the disposition of the post-trial motions, we affirm.

FACTS

The parties hotly disputed the facts of this case at trial, and continue to dispute them on appeal. Ms. Alwine contends that defendant Joseph J. Buzas subjected her to a torrent of unwanted physical and verbal sexual abuse during her two interviews with the Buzz. [2] Defendants maintain that Ms. Alwine invented most of the incidents of harassment. They also assert that she was not even interviewing for a job during her alleged second interview with Mr. Buzas.

---

[2] Mr. Buzas died on March 19, 2003, during the pendency of this appeal. Upon inquiry by this court, defendants filed a suggestion of death on the record, in which they stated that they believed no substitution of his personal representative was necessary.

The Minnesota Twins were never served in this case and are not a party to this appeal. Intervenor United States declined to file a brief.

-3-

When we encounter factual conflicts in reviewing a post-trial motion for judgment as a matter of law, we "construe the evidence and inferences most favorably to the nonmoving party, and refrain from making credibility determinations and weighing evidence." *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000). With this standard in mind, we will summarize the evidence presented at trial.

*"Tammy's job"*

The factual background of this case begins with the Buzz's previous general manager, Tamra Felker-White. Ms. Felker-White came to work for the Buzz in 1989, when she was twenty-four years old. Although she had no prior experience in sports management, Ms. Felker-White advanced rapidly to co-general manager of the team. By 1993, she was the team's vice president and general manager.

Ms. Alwine asserts that Ms. Felker-White had a sexual relationship with Mr. Buzas.[3] She further theorizes that after Ms. Felker-White left the Buzz in

---

[3]     The evidence at trial was ambiguous on this point, and must therefore be construed in favor of defendants. The testimony showed that on some occasions, Mr. Buzas acknowledged having a sexual relationship with Ms. Felker-White. On other occasions, he denied it. Ms. Felker-White was deposed on this issue. She admitted performing personal services for Mr. Buzas, such as doing his laundry, taking his clothes to the dry cleaner, making sure that his car had gas, and transporting him places, but denied having a sexual relationship with him.

July 1996, Mr. Buzas embarked on a campaign to replace Ms. Felker-White with a new female "general manager" who would meet his sexual needs. She claims that she was merely one of several women propositioned or otherwise harassed by Mr. Buzas.

Ms. Alwine presented testimony from three women, Margaret-Ann Madson Scott, Colleen Martin, and Emily Humphrey, each of whom stated that Mr. Buzas offered them "Tammy's job" after Ms. Felker-White's departure. The job offers came with the understanding that the women would provide Mr. Buzas with sexual services. In each case, the woman testified that his proposition was unwanted, offensive and was quickly rejected. Ms. Madson Scott and Ms. Humphrey also testified that Mr. Buzas sexually harassed them in other ways, verbally and physically. These incidents occurred both before and after Ms. Alwine interviewed for a job with the Buzz.

*The Chicago interview*

In late 1996 and early 1997, Ms. Alwine began looking for a job in sports. She testified that she holds a bachelor's degree in communications and had worked with several sports teams in the Fort Wayne, Indiana, area. She sent out resumes to various teams, including the Buzz. The resume she sent to the Buzz attracted the attention of Mr. Buzas. Ms. Alwine made telephone contact with

Mr. Buzas in May 1997 and arranged to meet with him in Chicago for a job interview.

Mr. Buzas met with her at their hotel. He asked Ms. Alwine to have lunch with him. After lunch, she placed her travel bag in Mr. Buzas' hotel room and they went for a walk. During this walk, Mr. Buzas asked her if she had a boyfriend. She told him that she had dated a ballplayer until recently, when they had broken up. Mr. Buzas asked if she were still in love with him, and when she replied "yes," Mr. Buzas stated that "he must have been good in the sack."

They returned to the hotel, where Mr. Buzas introduced her to several people by telling them that she was interviewing for "Tammy's position." Ms. Alwine knew from a baseball directory that Ms. Felker-White had been general manager of the Buzz. These initial references to "Tammy's position" made Ms. Alwine understand that she was interviewing for a general manager position.

Later that evening, as they were sitting at a short bistro table, Mr. Buzas began rubbing his foot on Ms. Alwine's leg between the ankle and her knee. She believed this was accidental, at first, and so she moved her legs over, but he continued. Mr. Buzas then invited her to attend a Utah Jazz game with him that evening, but she declined.

On her way to the elevator to get her bag from Mr. Buzas' hotel room, Mr. Buzas met a man named Karl Malone. Mr. Buzas told Mr. Malone that Ms. Alwine was interviewing for a position with the Buzz but that she was "a bit of a dingbat." (Mr. Malone did not testify at trial.)

Before they reached Mr. Buzas' room, they stopped in another hotel room, where a female friend of Mr. Buzas' was waiting with her son. Ms. Alwine contends that Mr. Buzas called her a dingbat and pushed her onto a bed in the presence of the woman and her son. Defendants called Mickey Hale, who stated she was the woman in the hotel room. She testified that she did not see Mr. Buzas push Ms. Alwine onto a bed or call her a dingbat.

Ms. Alwine and Mr. Buzas proceeded to his hotel room to get her bag. He asked her to stay the night with him in his bed. He also asked to hug her and was trying to kiss her when the phone rang. While Mr. Buzas was talking on the phone, Ms. Alwine left his room. Mr. Buzas later caught up with her and offered her $200 for her travel expenses. She accepted $150 to end the conversation and left.

Ms. Alwine left the hotel. As she was driving home to Fort Wayne, Mr. Buzas called her twice on her cell phone, asking her to return to Chicago, to attend the Jazz game, and to spend the night in his room. She refused.

*Salt Lake City interview*

During the next two weeks, Mr. Buzas called Ms. Alwine four more times. She agreed to meet him in Salt Lake City for an additional interview. She was to stay at the Holiday Inn. During one of their telephone calls after the Chicago interview, Mr. Buzas told Ms. Alwine that he could not make her general manager immediately, but hoped to do so within two years. He told her that if Tammy had stayed with him, she would have been making $125,000 per year. He then asked Ms. Alwine to stay at his hotel in Salt Lake City, Little America instead of the Holiday Inn, because he "needed a woman to warm his bed." [4]

Notwithstanding his boorish behavior, Ms. Alwine testified that she agreed to meet with Mr. Buzas in Salt Lake City for a second interview. She explained that she was "naive" and believed the job interview was a huge opportunity. She also believed that Mr. Buzas would behave himself better in front of his staff and season ticket holders than he had in Chicago.

*Costco incident/first day of interview*

Ms. Alwine's week-long interview in Salt Lake City began the morning after she arrived, when she met with Mr. Buzas in his office. Mr. Buzas ate his

---

[4]    Dorsena Picknell, vice president and assistant general manager for the Buzz, gave different reasons for Mr. Buzas' desire to have Ms. Alwine stay at Little America. She testified that Little America was less expensive and the ballplayers stayed at the Holiday Inn, where Ms. Alwine wanted to stay.

breakfast in front of Ms. Alwine, then asked her to go to Costco with him. On the way to his car after their time at Costco, Mr. Buzas spilled some peach juice on his inner thigh. He asked Ms. Alwine to clean it up for him. When she offered him a tissue from her purse, he said, "Tammy would have cleaned it off for me." To her response that she was not Tammy, Mr. Buzas replied, "I've noticed."

At the end of her first full day in Salt Lake City, Mr. Buzas offered to drive Ms. Alwine back to her hotel. She testified that she refused, and accepted a ride with a staff member instead. Brandi Redman, an employee of the Buzz, testified, however, that Ms. Alwine told her that she *had* accepted a ride from Mr. Buzas, and that he had "tried to put the moves on [her]" during the ride. Aplt. App., Vol. V at 1978. This was one of several inconsistencies in the evidence at trial that undermined Ms. Alwine's version of events.

*Second day of interview*

On the morning of the second day of her interview, Ms. Alwine found Mr. Buzas angry with her. She testified that staff members told her that Mr. Buzas was angry at her for riding back to her hotel with someone else. He initially refused to speak with her, though he later helped her pass out promotional items. From that time forward, Ms. Alwine testified, Mr. Buzas began a campaign of physical sexual harassment, bumping her knees out from under her and causing her to fall into his groin, snapping her brassiere strap,

smacking and touching her on her bottom, and brushing his arm against her breasts.

Ms. Alwine stated that she had complained about his behavior to numerous other employees of the Buzz, including Dennis Wansor, Brett Hullinger, and Kent Haslam. Oddly, however, she failed to mention until trial that Mr. Buzas had snapped her bra strap and rubbed against her breasts. Counsel questioned her as follows:

> Q. (By Mr. Naegle) And this is the first time you've indicated that those things happened?
>
> A. It's hard to believe.
>
> Q. It is indeed.
>
> A. I don't believe that it's never been said before.

*Id.*, Vol. III at 1095.

Mr. Haslam testified, however, that he saw Mr. Buzas flipping Ms. Alwine's bra strap when she stood in the door of the ticket office. He also saw Mr. Buzas knock her knees out from under her, and heard him tell her to "get off her fat ass and do some work." *Id.*, Vol. IV at 1427 (depo. p. 57). This was the only testimony at trial that directly corroborated Ms. Alwine's allegations of physical harassment by Mr. Buzas. Ms. Alwine also stated that when she complained to Mr. Wansor about Mr. Buzas' behavior after the first day, he said, "I can't believe you've figured it out already."

-10-

One of these incidents of "knee knocking" allegedly occurred in a ticket booth. Ms. Alwine testified that Lorraine Martinez witnessed this incident and told her that Mr. Buzas had done this to her several times. Ms. Martinez testified, however, that although she had witnessed Mr. Buzas knock the knees out of other people, male and female (she called it "his little joke"), she had never seen him do this to Ms. Alwine. [5]

*End of Salt Lake City interview*

On the second-to-last day of her interview in Salt Lake City, Ms. Picknell called Ms. Alwine and told her that Mr. Buzas was angry with her for not spending enough time with him. Ms. Picknell told her that she needed to spend more time with Mr. Buzas or get on a plane and go home. Ms. Alwine went to Mr. Buzas' office, and told him she thought she had done the right thing by meeting with other members of the Buzz staff and by spending time with them. Mr. Buzas had no response, but Ms. Alwine could tell that he was angry with her.

Ms. Alwine left Salt Lake City without a job with the Buzz. On August 12, 1997, she wrote a letter to Mr. Wansor in which she thanked him for "everything that you and the rest of the office staff did for me while I was in Salt Lake for my 'interview'." *Id.*, Vol. VI at 2219. She stated that "[e]veryone made me feel very

---

[5]     Both Ms. Picknell and Hilary Drammis, Mr. Buzas' daughter, also testified that Mr. Buzas knocked the knees out from both men and women.

at home and helped me out when I needed answers." *Id.* She asked Mr. Wansor to thank numerous Buzz employees, but did not mention Mr. Buzas.

Ms. Alwine stated that although Mr. Buzas never directly offered her money for sex or a job for sex, she understood that in order to receive the general manager job, she would have to have a personal relationship, including sex, with Mr. Buzas. About a month after the interview, Ms. Alwine spoke with Mr. Buzas on the telephone. He told her during the telephone conversation that she "was interested in something else" during the interview. Defendants contend that this "something else" was Shane Bowers.

*Shane Bowers*

Defendants presented a very different version of events. They argued that Ms. Alwine did not go to Salt Lake City to interview with Mr. Buzas at all. Instead, they claim, she went there to rekindle her romance with ballplayer Shane Bowers.

On direct examination, Ms. Alwine testified that she did not come to Salt Lake City to see anyone other than Mr. Buzas. She stated she had no other objective than to interview for the position of general manager of the Buzz. On cross-examination, however, she admitted that she saw Mr. Bowers at her hotel room many of the evenings during her interview and that she did try to rekindle their romantic relationship.

-12-

Defendants presented testimony that the Buzz has a policy against employees dating ballplayers. Ms. Alwine countered with evidence that this policy is unwritten and that Mr. Buzas had offered to set up another employee with a ballplayer. She also presented evidence of the work she did for the Buzz during her interview.

Finally, defendants presented a significant amount of testimony and other evidence to show that Ms. Alwine was not qualified to be general manager of the Buzz. Ms. Alwine countered with evidence that Ms. Felker-White had been only twenty-four years old and relatively inexperienced when Mr. Buzas began training her as assistant general manager.

ANALYSIS

1. *Quid Pro Quo* **and Hostile Work Environment**

Ms. Alwine's first two issues essentially merge into one. In her first issue, she complains that the district court incorrectly concluded that the facts of her case did not give rise to a hostile work environment claim. In her second issue, she contends that this threshold error led the district court to exclude evidence and to instruct the jury incorrectly.

We review the district court's determination on issues of law *de novo*. *See, e.g., EEOC v. W.H. Braum, Inc.*, 347 F.3d 1192, 1195 (10th Cir. 2003). We review its decision to admit or exclude evidence for an abuse of discretion.

*McCue v. State of Kan., Dep't of Human Resources*, 165 F.3d 784, 788 (10th Cir. 1999). The district court's decision to give or not to give a particular instruction is subject to review for an abuse of discretion; but where the real question raised is whether the jury should decide the matter at all, we consider that a question of law to be reviewed *de novo*. *Id.* at 787.

a. *Legal standard*

"Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). "[C]ourts have consistently recognized two distinct categories of sexual harassment claims: *quid pro quo* sexual harassment, and hostile work environment sexual harassment." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir. 1987). Where the plaintiff can show "that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands," she establishes an explicit change in her terms or conditions of employment, resulting in a *quid pro quo* case of sexual harassment. *Burlington*, 524 U.S. at 753-54. Where, however, her claim targets a supervisor's "severe and pervasive" sexually demeaning behavior rather than a fulfilled threat, the claim is properly characterized as a "hostile work environment" claim. *Id.* at 754. [6]

---

[6] This case is unusual, because Ms. Alwine alleges that Mr. Buzas sexually harassed her during a job *interview* rather than after she obtained employment.

(continued...)

The defendants initially moved for and received a directed verdict on Ms. Alwine's claim for hostile work environment sexual harassment. Aplt. App., Vol. V at 2005, 2008. The district court gave two reasons for the directed verdict. First, it concluded that the essence of Ms. Alwine's sexual harassment claim was *quid pro quo*: i.e., that she refused Mr. Buzas' sexual demands and therefore did not receive a job with the Buzz. Second, Ms. Alwine had failed to mention a hostile work environment theory in the pretrial order.

During a jury instruction conference the next day of trial, however, the district court changed course and permitted Ms. Alwine, over defendants' objection, to submit an instruction on hostile work environment sexual harassment to the jury. Defendants do not argue, as they did before the district court, that this instruction should not have been given because Ms. Alwine has no case for hostile work environment sexual harassment. Instead, they contend that the giving of this instruction, coupled with the fact that the district court did not grant judgment to them on the hostile work environment theory until all the evidence was in, means that Ms. Alwine was permitted to present her hostile work environment claim in full.

---

[6](...continued)
Defendants do not contend, however, that a hostile work environment claim is unavailable under these circumstances. We therefore need not decide whether Ms. Alwine was barred from asserting a claim for hostile *work* environment, where she never actually obtained employment with the Buzz.

Ms. Alwine asserts, however, that the district court's belated change of heart and submission of the instruction did not cure the prejudice to her case. She claims that before changing course, the district court made a number of crucial evidentiary rulings based on its false understanding of the law, requiring reversal.

b. *Excluded evidence*

Rather than itemizing these evidentiary rulings, Ms. Alwine points us to sixty-seven pages in the record in which she contends we can find at least twenty occasions of improper exclusion or limitation of evidence. Aplt. Opening Br. at 31, 40. She only presents argument on two of these exclusions: the testimony of Emily Humphrey, and evidence concerning Mr. Buzas' penile implant. We will address only those instances of excluded evidence on which she specifically presents an argument. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1246 n.13 (10th Cir. 2003) (stating this court need not search the appellate record to develop evidence not specifically identified in the appellate briefs).

(1) *Emily Humphrey testimony*

Ms. Humphrey testified by deposition. She was one of three women called by Ms. Alwine to testify about how Mr. Buzas harassed other women besides Ms. Alwine in the Buzz organization. This testimony bolstered Ms. Alwine's *quid pro quo* claim by showing that Mr. Buzas conditioned the general manager position on submission to his sexual advances. Ms. Alwine contends, however,

that the district court excluded other portions of Ms. Humphrey's testimony that would have bolstered her hostile work environment claim.

The district court excluded some of Ms. Humphrey's testimony out of concerns of relevance, hearsay, cumulative nature of the testimony, and prejudice under Federal Rules of Evidence 403 and 404(b). We are not concerned with these exclusions, except to the extent that they were tied to the district court's rejection of Ms. Alwine's hostile work environment theory.

Even assuming the district court was wrong in its initial conclusion that a hostile work environment claim was not available to Ms. Alwine, it did not abuse its discretion by excluding the evidence from Ms. Humphrey. In establishing a hostile work environment claim, Ms. Alwine could "only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment." *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995). The events described by Ms. Humphrey occurred beginning in June and July 1998, nearly one year after Ms. Alwine's experiences. Ms. Alwine could not have been aware of them during the time she was allegedly subject to a hostile work environment. Therefore, the testimony was properly excluded.

### (2) *Penile implant testimony*

Ms. Alwine challenges the exclusion of testimony about Mr. Buzas' penile implant. She sought to present testimony that Mr. Buzas obtained the implant to facilitate his ability to engage in sexual intercourse. She argues that this evidence would have been relevant to rebut defense counsel's inappropriate references to Mr. Buzas' age and health condition.

The district court did not exclude this evidence because it related to hostile work environment. Instead, it relied on the fact that the evidence was "terribly prejudicial and its probative value is slight given the fact that it was not brought up with the plaintiff." Aplt. App., Vol. V at 1774. Ms. Alwine stated she had no problem with the court's ruling so long as the defendants did not bring up Mr. Buzas' prostate cancer or alleged inability to perform sexually. Relying on this representation from Ms. Alwine, the court excluded all penile implant testimony, unless either party opened the door to it. We discern no abuse of discretion in the district court's decision to exclude this testimony, particularly in light of Ms. Alwine's consent to the district court's ruling.

Ms. Alwine argues, however, that the defense relied on the exclusion of this testimony to make improper comments about Mr. Buzas' health condition during its closing arguments. We consider more generally Ms. Alwine's objections to the defense's closing argument later in this order and judgment.

-18-

The only question now before us is whether defense counsel made comments about Mr. Buzas' prostate cancer or inability to perform sexually that transgressed the limitations by which the district court had justified exclusion of the penile implant testimony. We hold that he did not. *See id.*, Vol. III at 774-803. While counsel referred to Ms. Buzas' terminal illness at the time of trial, this illness was not prostate cancer, and counsel made no reference to Mr. Buzas' inability to perform sexually. We conclude that the district court did not abuse its discretion by excluding evidence of the penile implant.

c. *Plaintiff's proposed jury instructions*

Ms. Alwine also contends that the district court's erroneous conclusion about the availability of a hostile work environment theory led it to exclude two proposed jury instructions she offered concerning the testimony of other women who Mr. Buzas allegedly harassed. The first instruction, Plaintiff's Instruction No. 6, would have informed the jury that it could use the "testimony of other females . . . that . . . Buzas also sexually harassed them . . . as a guide in evaluating defendants' intent to link tangible job benefits to the acceptance of sexual advances." *Id.*, Vol. I at 210. The second instruction, Plaintiff's Instruction No. 7, would have allowed them to "consider the sexual harassment of other females as a guide in evaluating the totality of the circumstances surrounding the working and interviewing environment at defendant Buzz and

whether such conduct had the effect of unreasonably interfering with Ms. Alwine's performance as a job applicant or creating an intimidating, hostile, or offensive interviewing environment." *Id.* at 211.

The district court rejected instruction No. 6 because it represented "too much of a comment on the evidence by me." *Id.*, Vol. VI at 2132. It did give a limiting instruction, however, prior to the testimony of the other female witnesses. The first portion of this instruction informed the jury that "you may consider this evidence only for the limited purpose of determining what were the intent, purpose and motive of the defendants when they did not offer a job to Ms. Alwine." *Id.*, Vol. V at 1873. This instruction is substantially equivalent to the instruction Ms. Alwine offered. The principal difference between this part of the court's limiting instruction and proposed Plaintiff's Instruction No. 6 is that the limiting instruction does not direct any conclusion about whether Mr. Buzas sexually harassed the other females or about the defendants' intent and purpose in denying Ms. Alwine employment. We discern no abuse of discretion in the use of the limiting instruction rather than the substantially equivalent Plaintiff's Instruction No. 6.

To the extent Ms. Alwine complains about the remainder of the limiting instruction, we also discern no abuse of discretion. The district court instructed the jury that "[y]ou may not consider this evidence in deciding whether the

plaintiff has proven that Mr. Buzas did in fact engage in sexual harassment toward her. And for the limited purpose for which this evidence is going to be received, you may give it such weight as you feel it deserves." *Id.* This is a straightforward application of Fed. R. Evid. 404(b), which did not allow Ms. Alwine to prove her claim simply by showing what Mr. Buzas did to other women.

Plaintiff's Instruction No. 7 would also have been improper. There was no showing that Ms. Alwine was aware of the alleged harassment of other women. Two of the three women were not even employed by the Buzz when Ms. Alwine interviewed with Mr. Buzas. Such a broadly-worded instruction risked making Mr. Buzas' conduct toward other women part of the hostile work environment allegedly experienced by Ms. Alwine, in contravention of *Hirase-Doi*, 61 F.3d at 782.

2. **Improper argument by counsel**

Ms. Alwine argues that defense counsel's argument was suffused with errors and sufficiently egregious to entitle her to a new trial. The decision whether any misconduct was so egregious to require a new trial is left largely to the district court's discretion. *Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1175 (10th Cir. 2003). We will reverse only if the district court clearly

abused that discretion. *Id.* Ms. Alwine must show prejudice from the misconduct sufficiently serious to warrant retrial. *See id.*

Ms. Alwine complains that defense counsel improperly argued that the evidence failed to corroborate her story. She contends that any lack of corroboration resulted from the district court's erroneous exclusion of "much of the evidence that should have been admitted." Aplt. Br. at 43. As we have seen, however, the only two specific items of excluded evidence she points to in her argument were part of Emily Humphrey's testimony and evidence about Mr. Buzas' penile implant. Defense counsel mentioned Ms. Humphrey in his closing argument, but only to say that her testimony did not directly prove what had happened to Ms. Alwine. Aplt. App., Vol. III at 1160. Defense counsel argued that Mr. Buzas was old and feeble at the time of trial, but did not transgress the district court's direction not to mention his prostate cancer.

On the other hand, Ms. Alwine handed defense counsel a great deal of ammunition by her failure to call a number of other witnesses. Counsel noted that she had failed to bring in person before the jury "Lorraine Martinez, Mickey Hale, Julie, the receptionist, Kent Haslam, Dennis Wansor, Brett Hullinger, Larry Corrigan, Bill Smith, Jim Hochstrasser and Jackie Riley." *Id.*, Vol. III, at 1152-53. (Some of these witnesses did testify by deposition.) The defendants did call some of these witnesses, whom Ms. Alwine had not called, to present

their testimony in person, and that testimony was frequently unfavorable to Ms. Alwine. Ms. Alwine's failure to subpoena these witnesses for trial testimony was a legitimate subject of argument by the defense.

Ms. Alwine next complains that counsel improperly attempted to delve into her sexual history with Shane Bowers, in violation of the court's orders in limine. This was a delicate issue at trial, because much of defendants' case depended on showing that Ms. Alwine was dating Mr. Bowers, without unduly implying a sexual relationship between them. Accordingly, the district court gave defense counsel latitude to inquire of Ms. Alwine "if she saw Mr. Bowers while there, how many times she saw him, where she saw him, if they were alone, and if she attempted or they attempted in any way to renew their old relationship." *Id.* at 1063. Ms. Alwine's counsel stated she had no objection to this ruling. *Id.* at 1064. Ms. Alwine's counsel even helpfully added that the defense could inquire into whether "he visited in her motel room or she visited in his residence." *Id.*

Defense counsel's comments at closing did not contravene these restrictions. Ms. Alwine complains that counsel referred to her telephone records, allegedly showing thirty telephone calls to Mr. Bowers in forty-one days, to characterize her as "a woman obsessed with Shane Bowers." Aplt. Br. at 45 (quoting Aplt. App., Vol. III at 1145). This comment, however, did not refer to

-23-

Ms. Alwine's *sexual* history. [7] Although Ms. Alwine complains that there was no evidence that the telephone calls were made to Shane Bowers, there was sufficient evidence from which the jury could draw that conclusion. *See* Aplt. App., Vol. III at 1050-51; Vol. VI at 2301-10. The remaining comments about Ms. Alwine's relationship with Mr. Bowers, while at times skirting the limits the district court drew, *see id.*, Vol. III at 1148 ("And give her an A-plus for those rekindling efforts. She got him into her hotel room almost every night after the games, late at night alone, to rekindle her romantic relationships with Shane Bowers."), do not rise to the level of reversible error.

Ms. Alwine next complains that defense counsel improperly referred to Mr. Buzas' health during closing argument. Ms. Alwine subpoenaed Mr. Buzas but he did not testify at trial because of poor health. In order to prevent undue sympathy for Mr. Buzas, the district court stated that if Mr. Buzas could not testify, it would "allow a very brief statement in the form of testimony to the effect just probably one sentence that Mr. Buzas' health and age related infirmities do not permit him to testify, period." *Id.*, Vol. V at 1735.

On the night before Mr. Buzas was scheduled to appear, Ms. Alwine withdrew her subpoena. The next morning, however, Mr. Buzas entered the

---

[7]     There was no suggestion that these telephone conversations between Ms. Alwine and Mr. Bowers were themselves sexually charged.

-24-

courtroom in a wheelchair. He sat in the aisle. *Id.* at 1783. Ms. Alwine now complains that "defense counsel . . . wheeled Buzas into the courtroom, disrupting testimony, whereupon Buzas, in his extremely feeble condition, sat in a wheelchair, in the aisle, for approximately one hour." Aplt. Br. at 46. There is no indication in the record that any disruption caused by Mr. Buzas' presence lasted more than a few moments; Ms. Alwine did not register any objection to disruption of the proceedings or to Mr. Buzas' presence at the time he entered the courtroom. Moreover, as a party in the case, Mr. Buzas was entitled to be present at trial. *See generally* Fed. R. Evid. 615, advisory committee notes (stating exclusion of party to action from trial would "raise serious problems of confrontation and due process.").

After Mr. Buzas appeared in the courtroom, the district court stated it would allow defendants' counsel to explain to the jury that Mr. Buzas had a terminal illness. Aplt. App., Vol. VI at 2039. The court considered this fact relevant because Ms. Alwine was seeking punitive damages designed to deter future misconduct. Counsel was, however, admonished not to belabor the point about Mr. Buzas' health at closing. *Id.* at 2089.

In spite of this admonition, defense counsel argued extensively about Mr. Buzas' health, presenting an emotional appeal to the jury:

> Let me tell you also how disappointed I am personally that
> Mr. Buzas was not able to be here. There's no one in this trial that

wanted to testify more than he did. He dragged himself here Tuesday and was – you were able to see him for a moment and saw the condition that he's in. His arms and legs are about that big. He was diagnosed, as you know, with a terminal illness in 1994, and he is suffering mightily from it.

*Id.*, Vol. III at 1138.

Now . . . you'll note also that the plaintiff has asked for punitive damages. Punitive damages are something to punish, to see that it never happens again, to teach someone a lesson. Ladies and gentlemen, this case is not a case of good versus evil. It's not a case about right versus wrong. This is a case about money. This is a case where these folks want 1.6 million of Joe's money. Will any award against Joe or the Buzz teach Joe a lesson? How can it? You saw him. He is terminally ill from chemotherapy, with legs and arms this big around. He can't even walk. He couldn't even come to his own trial and defend himself. He is 84 years old. He doesn't have anything to do with the Buzz organization other than sitting in the sky box at this point, and hasn't had for years.

. . . You won't be affecting Joe. You'll be affecting Joe's grandchildren, his grandchildren who I propose to you are far more deserving of his money than the plaintiff.

*Id.* at 1165.5-1165.75 (omitted from appendix; attached to Aplt's Br.).

Because Ms. Alwine did not object to this argument at the time it was made, she must show "substantial injustice" to obtain reversal. *Abuan*, 353 F.3d at 1175. [8] Although defense counsel's argument violated the district court's

---

[8]     In her reply brief, Ms. Alwine argues that she was not required to object to every instance of improper argument to preserve her objections for appeal, and that doing so would have prejudiced her in the eyes of the jury. *See, e.g., Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 n.26 (3d Cir. 1992). The first comments to which she now objects, however, occurred shortly after

(continued...)

-26-

admonitions and improperly evoked sympathy for Mr. Buzas and his grandchildren, we conclude that it did not rise to the level of a substantial injustice. First, the jury's verdict is sufficiently supported by the record. Given the inconsistencies and lack of corroborating evidence for much of Ms. Alwine's story, the jury could have found her not credible as a witness. Second, the court specifically instructed the jury that it was "not to be governed by sympathy, prejudice, or public opinion," Aplt. App., Vol. VI at 2162, and that "[s]tatements and arguments of counsel are not evidence," *id.* at 2164. Third, the district court had permitted counsel to refer to the fact that Mr. Buzas was terminally ill. Fourth, counsel's argument referred in part to matters that the jury had seen with their own eyes: the deterioration of Mr. Buzas' physical condition. Finally, much of counsel's improper argument went to the issue of punitive damages, which could not be awarded unless the jury found for Ms. Alwine on her Title VII claim, which it did not. *See id.* at 2201 (punitive damages instruction). In sum, we are "satisfied that the verdict was not merely a result of passion aroused though

---

[8](...continued)
defense counsel began his argument, before she had interposed any other objections. Aplt. App., Vol. III at 775. The other comments, which occurred near the end of counsel's argument, were by far the most egregious comments made in the argument. We cannot say that strategic considerations excuse Ms. Alwine's failure to object to them.

-27-

extreme argument." *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1285 (10th Cir. 2003) (quotation omitted).

### 3. **Evidence from non-decision makers**

Ms. Alwine next argues that reversal is required because Mr. Buzas, who was the sole decision-maker, did not testify at trial. She claims there was therefore no evidence of a legitimate, non-discriminatory reason for the Buzz's failure to hire her, and she is entitled to judgment as a matter of law on her sexual harassment claim. [9] We review *de novo* the district court's decision on a motion for judgment as a matter of law. *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996). Such a judgment is appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found; we must construe the evidence and inferences most favorably to the nonmoving party." *Id.* (quotation omitted).

Ms. Alwine has not met this standard. In order to require defendants to come forward with a legitimate, non-discriminatory reason for this employment action, she was first required to establish a prima facie case of sexual harassment.

---

[9]    Ms. Alwine's argument relates logically only to her *quid pro quo* sexual harassment claim, which challenges defendants' failure to hire her and therefore implicates the decision-maker's reasoning for his employment action. *Cf. Martin v. Nannie & Newborns, Inc.*, 3 F.3d 1410, 1417 n.8 (10th Cir. 1993) (stating plaintiff's failure to rebut legitimate, non-discriminatory reason for her firing was relevant only to *quid pro quo* claim, not hostile work environment claim).

*See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.* , 530 U.S. 133, 142 (2000). Ms. Alwine's *quid pro quo* claim charges that the Buzz failed to hire her; accordingly, we apply the prima facie case requirement applicable to a failure to hire claim. *Cf. Martin v. Nannie & Newborns, Inc.* , 3 F.3d 1410, 1416-17 (10th Cir. 1993) (tailoring prima facie case requirement in sexual harassment case to adverse employment action claimed by plaintiff). A plaintiff establishes a prima facie case of failure to hire by showing (i) that she belongs to a protected class; (ii) that she applied for and was qualified for a job for which the employer was seeking applicants; (iii) that despite her qualifications, she was rejected; and (iv) that after her rejection, the position remained open and the employer continued to seek applicants from persons of her qualifications. *See McDonnell Douglas Corp. v. Green* , 411 U.S. 792, 802 (1973).

There was evidence presented in this case from which the jury could have concluded that Ms. Alwine was not qualified for the position of general manager of the Buzz, and therefore did not satisfy her prima facie case. [10] She had limited prior experience in professional sports. Aplt. App., Vol. III at 1173-77. When she sent her resume to the Buzz, she sought a promotions/sales position rather

_____

[10]    This "limited experience" as a factor in determining whether she met her prima facie case should be distinguished from the defendants' attempt to use her limited experience as a legitimate, non-discriminatory reason for failing to hire Ms. Alwine.

than a management position. *Id.*, Vol. VI at 2215. Her resume did not include any experience in sports management, other than as a director of group sales for a basketball team. *Id.* at 2217. The rejection letters she received from numerous other sports teams about this time contain no indication that she sought a position as general manager. *Id.* at 2221-34. Although a finder of fact *could* have concluded that she met her prima facie case, given this lacuna in her evidence, she was not entitled to judgment as a matter of law. [11]

4. **Mixed motive defense instructions**

Ms. Alwine challenges jury instructions 16 and 17, dealing with mixed motive. She contends that a mixed motive analysis was applicable only to her retaliation claim. These instructions, she says, muddied the waters by permitting the defendants also to assert a mixed motive defense on her *quid pro quo* harassment claim. In order to understand why Ms. Alwine's argument fails, we must first lay some groundwork concerning the role of the "mixed motive" analysis in discrimination cases.

---

[11] Ms. Alwine argues that the district court's limiting instruction pertaining to Mr. Buzas' harassment of others prevented the jury from using their testimony "to determine what the requirements of the general manager position, as Joe Buzas envisioned it, were." Aplt. Reply Br. at 22. If this were true, it might have an effect on Ms. Alwine's ability to present her prima facie case. We do not read the limiting instruction so narrowly, however: it permitted the jury to use the testimony of other women to determine "what were the intent, purpose and motive of the defendants when they did not offer a job to Ms. Alwine." Aplt. App., Vol. V at 1873. This, presumably, included the qualifications for the position.

-30-

In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court held that "Title VII [condemns] even those decisions based on a mixture of legitimate and illegitimate considerations." *Id.* at 241. For this reason, once a plaintiff has proved that impermissible discriminatory criteria played a motivating part in the employer's decision, the employer may avoid liability only if it proves, by a preponderance of the evidence, that it would have made the same decision even if it had not taken the discriminatory criteria into account. *Id.* at 259. This mixed-motive analysis applies only in cases where the decision "was the product of a mixture of legitimate and illegitimate motives," *id.* at 247, and therefore does not implicate the burden-shifting analysis described in *McDonnell Douglas*, 411 U.S. 792. Instead, the employer's burden under *Price Waterhouse* is properly deemed an *affirmative defense* to the plaintiff's showing that it relied in part on discriminatory criteria to deny her an employment benefit. *Id.* at 246.

Using this characterization of the employer's burden as an affirmative defense as a jumping-off point, Ms. Alwine argues that the defendants were not entitled to a mixed motive instruction because the Supreme Court has forbidden the assertion of *any* affirmative defense to harassment when a supervisor's harassment culminates in a tangible employment action. *See Burlington*, 524 U.S. at 765; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998). This argument, however, misapprehends the holding in *Burlington*, which forbids only

the assertion of the particular affirmative defense to *vicarious liability* recognized in that case, not of affirmative defenses in general. *See* 524 U.S. at 765. [12] Ms. Alwine cites no authority to the effect that the affirmative defense discussed in *Price Waterhouse* is no longer available in "mixed motive" cases. [13] The recent Supreme Court case of *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148 (2003), suggests that the defense is alive and well. *See id.* at 2151-52; *see also Smith v. Cashland, Inc.*, 193 F.3d 1158, 1160-62 (10th Cir. 1999) (permitting employer, in *quid pro quo* sexual harassment case decided after *Burlington* and *Faragher*, to assert affirmative defense of legitimate business reason). Her argument therefore lacks merit.

Ms. Alwine further argues that a mixed motive instruction is inappropriate because defendants never presented any testimony from Mr. Buzas concerning his reasons for not hiring her, and there was therefore no "mixed motive" demonstrated in this case. She fails to show that she raised this argument in her

---

[12]  The *Burlington* defense to hostile work environment sexual harassment requires the employer to show two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington*, 524 U.S. at 765.

[13]  Ms. Alwine makes no argument concerning whether the limitation of the mixed motive defense codified at 42 U.S.C. § 2000e-5(g)(2)(B) applies in this case, and so we have no occasion to consider that issue.

objections to the challenged jury instructions in the district court; therefore the argument is waived.

5. **Cumulative error**

Finally, Ms. Alwine argues that this court should examine cumulatively all the errors on appeal to determine whether, taken as a whole, they had a substantial influence on the jury's verdict. The only significant errors we have identified are those to which Ms. Alwine did not object: defense counsel's arguments attempting to create sympathy for Mr. Buzas, and his comments about Ms. Alwine's relationship with Mr. Bowers. Even considered synergistically, these errors did not rise to the level of reversible error.

The judgments of the district court are AFFIRMED.

Entered for the Court


Terrence L. O'Brien
Circuit Judge