**UNIVERSITY OF KANSAS**
**and Kansas Athletics,**
**Inc., Plaintiffs,**

v.

**Larry SINKS, Clark Orth, and Victory Sportswear, L.L.C. (collectively d/b/a/ Joe–College.com), Defendants.**

Case No. 06–2341–JAR.

United States District Court,
D. Kansas.

Dec. 1, 2008.

Opinion Denying Post-Trial
Motions July 28, 2009.

Alicia Grahn Jones, Jerre B. Swann, R. Charles Henn, Jr., William H. Brewster, Kilpatrick Stockton LLP, Atlanta, GA, Douglas M. Greenwald, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Plaintiffs.

Arthur E. Palmer, Cody G. Robertson, Goodell, Stratton, Edmonds & Palmer LLP, Topeka, KS, James W. Tilly, The Tilly Law Firm, Tulsa, OK, for Defendants.

## AMENDED MEMORANDUM AND ORDER

JULIE A. ROBINSON, District Judge.

The Court now considers the parties' motions for judgment as a matter of law. Plaintiffs moved for judgment pursuant to Fed.R.Civ.P. 50(a) at the close of all evidence and also renewed their summary judgment motions. Plaintiffs also filed written motions: Motion for Judgment as a Matter of Law on the Secondary Meaning of the Crimson–and–Blue Color Scheme and the Inherent Distinctiveness of Plaintiffs' Word Marks (Doc. 323); and Plaintiffs' Motion for Judgment as a Matter of Law on Defendant Orth's Mere Printer Defense (Doc. 325). Defendants orally moved for judgment as matter of law at the close of plaintiffs' case and renewed those motions at the conclusion of all evidence. Specifically, defendants asked for judgment on the trademark dilution claims and on the infringement claims based on plaintiffs' failure to prove secondary meaning for certain allegedly infringing marks.

Subsequently, the jury returned a verdict in favor of plaintiffs on all claims. The jury further found all three defendants liable on each of the six claims.[1]

---

1. The jury made separate findings on the trademark infringement/unfair competition claims and the trademark dilution claims with

The Court has considered the parties' oral argument on the issues raised in their Rule 50(a) motions, as well as the submitted briefs.

Before the Court was able to rule on the issues raised in the Rule 50(a) motions, plaintiffs filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b) (Doc. 345).[2] In that motion, plaintiffs argue that the jury's verdict contradicts the evidence presented at trial and, in some cases, the jury made inconsistent findings. Defendants have responded to this motion, so it is ripe for decision. As explained more fully below, the Court denies the parties' pre-verdict motions. The Court directs the clerk to enter final judgment on the verdict and denies plaintiffs' renewed motion for judgment as a matter of law.

## I. Standard

 Under Federal Rule of Civil Procedure 50(a), a court may grant judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[3] A moving party "is entitled to a judgment if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position."[4] "The question is not whether there is literally no evidence supporting the nonmoving party but whether there is evidence upon which a jury could properly find for that party."[5] In order for a jury to properly find for a party, "more than a scintilla of evidence" must be presented to support a claim.[6] When the moving party also carries the burden of proof, the motion "may be granted only where [the movant] has established his case by evidence that the jury would not be at liberty to disbelieve."[7] "[T]he evidence is tested for overwhelming effect. . . . A directed verdict for the party bearing the burden of proof may be granted only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in its favor."[8]

 In considering a motion for judgment as a matter of law, the court reviews all of the evidence in the record and construes it in the light most favorable to the nonmoving party.[9] But the court must refrain from making credibility determinations and weighing the evidence.[10] "The jury has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving

regard to each of the 203 T-shirts at issue in the case. (Doc. 332.)

2. Judgment has not yet been entered in this matter; therefore, plaintiffs' renewed motion for judgment as a matter of law is timely. *See* Fed.R.Civ.P. 50(b); *see also McCroy ex rel. McCroy v. Coastal Mart, Inc.*, 207 F.Supp.2d 1265, 1268–70 (D.Kan.2002).

3. Fed.R.Civ.P. 50(a)(1).

4. *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir.2000) (quotations omitted).

5. *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 685 (10th Cir.2007).

6. *Id.* (citing *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1278 (10th Cir.2003)).

7. *Black v. M & W Gear Co.*, 269 F.3d 1220, 1238–39 (10th Cir.2001) (quotation omitted).

8. *Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir.1984).

9. *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir.2000) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Deters*, 202 F.3d at 1268).

10. *Id.*

conflicts in the evidence, and reaching ultimate conclusions of fact." [11]

## II. Discussion

### A. Defendants' Motion on Actual Dilution

Claims for federal trademark dilution are governed by the Trademark Dilution Revision Act ("TDRA") of 2006.[12] The TDRA provides,

> The owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.[13]

Even though the recent amendments to the TDRA only require a showing of a likelihood of dilution, in order to recover monetary damages on this claim, plaintiffs must show actual dilution since the allegedly unlawful conduct began before October 6, 2006.[14]

■ Defendants ask for judgment as a matter of law on the issue of actual dilution because the only evidence presented by plaintiffs was testimony from Jim Marchiony, a KU employee, about being approached by anonymous KU fans complaining about the negative effect that defendants' T-shirts have on the University's reputation. But plaintiffs correctly point out that there is sufficient evidence in the trial record that would allow the jury to properly find for plaintiffs on the issue of actual dilution. In addition to Marchiony's testimony, there was evidence in the form of web blog entries in the *Lawrence Journal World* that show that certain people in the Lawrence community believed the T-shirts to be offensive. Under the standard enunciated in Rule 50(a), this evidence was sufficient for the jury to find in favor of plaintiffs on the issue of actual dilution.[15]

### B. Protectablility

Defendants orally moved for judgment as a matter of law on the secondary meaning of plaintiffs' marks. According to defendants, there was no evidence presented about when certain marks acquired secondary meaning, so there is no way to tell if it was established prior to defendants' use of the marks. Plaintiffs also moved for judgment on the secondary meaning of the crimson and blue color scheme and the inherent distinctiveness of their word marks.

■ The Court has already found that the marks "KU," "Kansas," and the Jayhawk design marks are incontestable under 15 U.S.C. § 1065, and are therefore protectable as a matter of law.[16] "Jayhawks," "Allen Fieldhouse," and "The Phog" are registered trademarks, but are still contestable because they have not

---

11. *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir.2000) (internal quotations and citation omitted).

12. Pub. L. No. 109–312, 12–0 Stat. 1730 (amending Pub. L. No. 104–98, 109 Stat. 985 (1995)), codified at 15 U.S.C. § 1125(c)(1).

13. 15 U.S.C. § 1125(c)(1).

14. 15 U.S.C. § 1125(c)(5).

15. The parties are reminded that they jury answered "Yes" to Question 7 on the verdict form: "Do you find actual confusion with regard to the trademark infringement and unfair competition claims and/or do you find actual dilution with regard to the dilution claims?" (Doc. 332.)

16. (Doc. 228 at 29.)

been in continuous use for five years since registration. For these contestable marks, a rebuttable presumption of validity applies.[17] The presumption can be overcome by defendants, if they are able to show by a preponderance of the evidence that information in the registration is not true.[18]

■ The Lanham Act protects both registered and unregistered trademarks.[19] "[T]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)."[20] " 'A mark must be capable of distinguishing the products [or services] it marks from those of others.' "[21] A mark can be distinctive because it is "inherently distinctive" or because it has developed secondary meaning, which happens when "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."[22] There are five categories of marks with respect to protection: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful.[23] The Tenth Circuit has explained:

> The trademark protection afforded each type of mark is related to how closely the mark identifies the source of the product. "Because a generic mark

refers to a general class of goods, it does not indicate the particular source of an item. Consequently, such a mark receives no legal protection and may not be registered alone as a trademark." [*Beer Nuts, Inc. v. Clover Club Foods Co.,*] 711 F.2d [934] at 939 [ (10th Cir. 1983) ]. At the other end of the spectrum, suggestive and fanciful marks may be registered without proof that they identify the source of the product. *Id.* Descriptive terms fall in the middle on the continuum. "Because a descriptive term is one which a competitor would likely need to use in describing his product, the term does not indicate that a product comes from a single source. Therefore, a trademark that is descriptive may be registered only if it has acquired a secondary meaning by becoming 'distinctive of the applicant's goods in commerce.' " *Id.* at 939–40.[24]

Colors can never be inherently distinctive; they are only protectable if they have acquired secondary meaning.[25] The categorization of the remaining unregistered marks is a factual question.[26] The factfinder is "to determine, based on the evidence before it, what the perception of the purchasing public is."[27]

---

**17.** 15 U.S.C. § 1057(b). In discussing the "Jayhawks" mark, the Court only refers to the mark registered for use on apparel. *See* Trial Ex. 440.

**18.** *See Educ. Dev. Corp. v. Econ. Co.,* 562 F.2d 26, 28 (10th Cir.1977).

**19.** *See* 15 U.S.C. §§ 1114, 1125(a).

**20.** *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767–68, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

**21.** *Donchez v. Coors Brewing Co.,* 392 F.3d 1211, 1215 (10th Cir.2004) (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 344 (2d Cir.1999)).

**22.** *Wal–Mart Stores, Inc. v. Samara Bros.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (internal quotation omitted).

**23.** *See id.; Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 923 (10th Cir.1986).

**24.** *Beer Nuts, Inc.,* 805 F.2d at 924.

**25.** *Wal–Mart Stores, Inc.,* 529 U.S. at 211, 120 S.Ct. 1339; *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 162–63, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

**26.** *Donchez,* 392 F.3d at 1216.

**27.** *Id.*

### 1. Defendants' Rule 50(a) Motion

Defendants argue that there can be no trademark infringement unless plaintiffs prove that they possessed secondary meaning in their marks at the time defendants began using the marks.[28] In order to defeat defendants' motion, plaintiffs must simply point to evidence in the trial record that could persuade a reasonable jury to find for plaintiffs. Defendants argue that there was no evidence about when the following marks acquired secondary meaning, if at all: all variations of the "Phog" mark, "Fighting Manginos," "Rock Chalk Jayhawk," "Kivisto Field," "Allen Fieldhouse," and the "Jayhawk Football," "Jayhawk Basketball," and "Jayhawk Baseball" marks.[29] Despite initially arguing that there was "no" evidence about when plaintiffs began using these marks, defendants argued that the testimony of Paul Vander Tuig about the length of time these marks have been used by plaintiffs is not enough to satisfy their burden of proof. The Court disagrees. The Court is not to weigh the credibility of witnesses when deciding a motion under Rule 50; instead, it is to consider defendants' motion in the light most favorable to plaintiffs. Furthermore, plaintiffs were not necessarily required to establish secondary meaning for all of their marks—only for the marks that are categorized as descriptive or that are not otherwise inherently distinctive.

■■■ Vander Tuig testified that "the Phog" has been used in media guides, as well as on the banner that has hung prominently in Allen Fieldhouse since 1988. He further testified that it has been used on licensed apparel since at least the early 1990s when he began working at KU. Van-

der Tuig also testified about "Rock Chalk Jayhawk." [30] He explained that the phrase was first used by students in the 1880s and has been used for years at KU events as well as on licensed KU products since at least as early as he has worked for KU. These are all marks that are federally registered, so they are already afforded a presumption of validity and defendants point to no evidence that would rebut that presumption. But even if they are not deemed inherently distinctive, Vander Tuig's testimony is sufficient for a reasonable jury to have found secondary meaning.

■■■ With regard to "Kivisto Field," Vander Tuig testified that Tom and Julie Kivisto donated the money to upgrade the football field at Memorial Stadium and so KU decided to name the field after the Kivistos. Vander Tuig testified that KU conducted a naming ceremony for the football field in 2006 and pointed to evidence showing that the Kivistos consented to KU's use of their name as a trademark on apparel. This evidence was sufficient for the jury to find that Kivisto Field was either inherently distinctive or acquired secondary meaning before defendants began using the mark. Likewise, defendants urge that there was no evidence that "Allen Fieldhouse" acquired secondary meaning prior to the state registration of that mark. Vander Tuig testified extensively about the history of the fieldhouse—it is over fifty years old—and how it was named after Phog Allen, the longstanding basketball coach.

■■■ As to the "Fighting Manginos" mark, there was one blue T-shirt present-

---

**28.** *See* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:34 (4th ed.2008) (collecting cases).

**29.** Defendants also argued that they are entitled to judgment on any use of the marks

"Regents Center" and "Edwards Campus." As plaintiffs concede, no such claims exist and these marks are not at issue.

**30.** (*See* Pl. Trial Ex. 73.)

ed to the jury for decision that involved that mark.[31] There was evidence that Mark Mangino is the KU football coach and evidence about the crimson and blue color scheme as it relates to KU. The Court finds that these words, when used on a blue T-shirt, at a minimum could be found to be descriptive and to have acquired secondary meaning. The mark makes a descriptive use of Mark Mangino's name to indicate the KU football team and uses the KU school colors to convey that message. Finally, Vander Tuig testified about the state law registrations for the marks "Jayhawk Basketball," "Jayhawk Football," and "Jayhawk Baseball," which were all filed in January 2006. Defendants are unable to point to any legal authority for the proposition that the state registrations must have predated defendants' use in order to be protected under Kansas law.[32] Moreover, there was ample evidence presented through both Vander Tuig's and Marchiony's testimony, that the "Jayhawk" mark is protectable. Accordingly, judgment as a matter of law is not appropriate and defendants' motion is denied in its entirety.

### 2. Plaintiffs' Rule 50(a) Motion

Plaintiffs argue for judgment as a matter of law on the secondary meaning of the crimson and blue color scheme and on the inherent distinctiveness of certain word marks. In deciding this motion, the Court must apply the heightened standard of proof that applies to movants who also bear the burden of proof at trial. Plaintiffs first urge that they presented overwhelming evidence that the crimson and blue color scheme acquired secondary meaning prior to January 2006. Further, plaintiffs argue that they are entitled to judgment on the protectability of their word marks because they are arbitrary and thus, inherently distinctive.

■■■■■■ To determine whether a mark has acquired secondary meaning, proof of the following factors is relevant: (1) consumer testimony or surveys; (2) advertising; (3) unsolicited media coverage; (4) exclusivity and length of use; (5) sales success; and (6) intentional copying.[33] Plaintiffs first discuss the length and manner of use, pointing to Marchiony's and Vander Tuig's testimony that the crimson and blue color scheme has been a key part of the KU experience since at least the 1890s. Plaintiffs also produced evidence that KU has prominently displayed these colors in University materials such as media guides, recruiting materials, orientation guides, catalogs, alumni publications, and athletic uniforms for decades.[34] Next, plaintiffs point to evidence of the history of successful sales of items bearing the crimson and blue color scheme since at least 1993, resulting in millions of dollars worth of sales.[35] Plaintiffs also cite unsolicited media coverage—media references that include the color scheme and Marchiony's testimony about the frequent broadcasts of KU basketball games. Finally, plaintiffs

---

**31.** (Ex. 209.) Plaintiffs position on its use of this mark has been inconsistent. During oral argument on defendants' motion, plaintiffs stated that they did not claim that the "Fighting Manginos" word marks alone were protectable. Instead, plaintiffs argued that the T-shirt at issue with that language is infringing because the words appear with the crimson and blue colors and are likely to cause confusion in the marketplace. In their own Rule 50(a) motion, plaintiffs argue that the "Fighting Manginos" word mark is protectable as a

matter of law because it is arbitrary, and thus, inherently distinctive. (Doc. 324 at 10.)

**32.** *See* K.S.A. § 81–213.

**33.** *W. Chem. Pumps, Inc. v. Superior Mfg., Inc.,* 989 F.Supp. 1112, 1120 (D.Kan.1997).

**34.** (*See* Trial Ex. 113.)

**35.** (*See* Trial Exs. 114, 446.)

refer the Court to evidence that defendants intentionally copied the color scheme. Specifically, defendant Orth testified that Sinks ordered blue shirts for his T-shirt designs because it is one of KU's colors.[36] Defendant Sinks also testified that he selected royal blue shirts in order to appeal to KU fans and that the T-shirts that read "Go Big Blue" are intended to reference KU's color blue.[37]

While plaintiffs are correct that all of this evidence supports a finding of secondary meaning of the crimson and blue color scheme, the Court must find that this evidence, without weighing the credibility of the witnesses, is so overwhelming that the jury could have reached no other conclusion. The Court is unable to find that plaintiffs meet this heightened burden. And even if the Court agrees with plaintiffs that the evidence is so one-sided on this issue that the jury could have reached no other decision but that plaintiffs had established secondary meaning in the KU color scheme such that it was protectable under trademark laws, such a finding alone has no bearing on the jury's verdict—plaintiffs were required to show that the protectable marks were likely to cause confusion in the marketplace. It is just as likely that the jury's verdict was based on the likelihood of confusion analysis.

 Plaintiffs also ask for judgment as a matter of law on the inherent distinctiveness of its word marks "Jayhawks," "Rock Chalk Jayhawk," "Rock Chalk," "Jayhawk Baseball," "Jayhawk Basketball," "Jayhawk Football," "Fighting Manginos," "Kivisto Field," "Allen Fieldhouse," "The Phog," "Late Night in the Phog," and "Beware of the Phog." Plaintiffs assert that the evidence shows that the marks are necessarily arbitrary, and thus, inherently distinctive. The word marks "Jayhawks,"

"Rock Chalk Jayhawk," "Allen Fieldhouse," and "The Phog" are registered with the United States Patent and Trademark Office. These marks are entitled to a rebuttable presumption of validity. Further, the marks that are registered with the State of Kansas qualify for protection under the Kansas statute. Even if the Court found that this evidence is conclusive on the issue of protectability, it has no impact on the likelihood of confusion analysis. Therefore, plaintiffs' motion for judgment is denied.

### C. Plaintiffs' Rule 50(a) Motion on the Mere Printer Defense

Plaintiffs filed a motion for judgment under Rule 50(a) on the mere printer defense as it pertains to defendant Orth. The Court finds that plaintiffs' motion pertaining to defendant Orth is moot—the jury was instructed on the mere printer defense and obviously rejected it, at least with regard to the T-shirts that it found were subject to liability.

### D. Plaintiffs' Rule 50(b) Motion

Plaintiffs renewed their motion for judgment as a matter of law on: (1) defendants' T-shirts bearing the "Kansas" mark, including those that had already been deemed to infringe KU's "Kansas" mark by this Court at summary judgment; (2) defendants' T-shirts bearing the terms "Hawk" or "Hawks" which Mr. Sinks testified were intentionally used to refer to plaintiffs' "Jayhawks" mark; and (3) defendants' T-shirts bearing KU's Crimson-and-Blue Color Scheme. The Court addresses each in turn and again applies the heightened standard of proof that applies when the movant also carries the burden of proof.

---

**36.** (Doc. 324 at 8, quoting Orth Trial Tr. at 63–64.)

**37.** (Doc. 335 at 123–24.)

### 1. "Kansas" T-shirts

In its March 19, 2008 Memorandum and Order, this Court granted plaintiffs' motion for summary judgment on four specific shirts containing plaintiffs' marks.[38] Despite this ruling, plaintiffs opted to present these shirts to the jury for consideration, "so that the jury could consider these shirts in determining Defendants' willful intent and damages." But rather than present them for this limited purpose, the parties jointly submitted a verdict form that included these shirts and requested the jury to determine whether they were "infringing," and/or "diluting," or "neither." Defendants urge that it was plaintiffs' choice to submit these shirts to the jury and that, instead, they should have asked the Court to instruct the jury that the shirts had already been determined to be infringing and that they should only consider them for the limited purpose of assessing intent and damages.[39] Defendants reason that plaintiffs invited the jury to reconsider the Court's previous ruling and should be bound by the jury's determination.

 The Court granted summary judgment on these T-shirt designs and defendants did not seek reconsideration of that decision. Still, only final judgments qualify as law of the case.[40] The Court found that the "Kansas" mark was protectable as a matter of law because it is incontestable. Further, the Court found that those T-shirts displayed marks that are overwhelmingly similar to KU's marks and that the striking similarities trigger a presumption that defendants intended to infringe; in fact, the Court found that "all of them are highly similar to officially licensed products when comparing their overall look, sound, and meaning." Those two factors weighed so heavily in favor of a likelihood of confusion that the Court held on summary judgment that no reasonable jury could find otherwise. Defendants argue that "the trial record contains evidence not available on summary judgment from which the jury might have properly

---

**38.** Specifically, the Court granted summary judgment on the shirts presented in Doc. 144, Ex. A at 1–3, 85. The only two T-shirts that the Court specifically granted summary judgment for but that the jury found noninfringing are pictured in Trial Exhibits 78 and 126 (Doc. 332 at 6, 7.) One T-shirt is red and the other is blue; both are one-sided T-shirts that have the "Kansas" mark across the front. In its summary judgment order, the Court stated: "in their statement of uncontroverted facts, plaintiffs refer to these as 'examples.' While the Court is unable to locate other instances like these in its cursory review of the exhibits, its findings with regard to these shirts apply to any other shirts that similarly include KU's marks without any other differentiating marks or additional non-infringing language. It is incumbent upon plaintiffs to identify any such additional shirt designs." In their renewed motion, plaintiffs identify three other T-shirts that were included on the verdict form: Trial Exhibits 77, 125, and 416 at 78 (Doc. 332 at 6, 93). The Court agrees that these shirts are included in the Court's summary judgment ruling for plaintiffs.

**39.** The Court notes that defendants alone proposed that the jury render a decision on each of the 203 T-shirts at issue. However, defendants failed to submit a workable proposed verdict form to the Court. Instead, after trial had already commenced, the parties and the Court relied upon plaintiffs to generate a verdict form with pictorial representations of the T-shirts for decision since they alone had the electronic capability to do so. The Court surmises that the five "Kansas" T-shirts that had been ruled on at summary judgment were included inadvertently during this hurried process.

**40.** *Echo Acceptance Corp. v. Household Retail Servs., Inc.,* 267 F.3d 1068, 1079 (10th Cir. 2001); *In re Unioil, Inc.,* 962 F.2d 988, 993 (10th Cir.1992); *see* Fed.R.Civ.P. 54(b) ("any order ... that adjudicates fewer than all the claims ... may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

concluded that the Original 'Kansas' Shirts were not infringing," pointing to certain evidence that they argue suggests "Kansas" is a weak mark. Specifically, defendants urge the Court to consider Vander Tuig's testimony about the "Kansas" mark that not all uses of the mark on T-shirts are infringing and that it would depend upon the context of the mark whether "Kansas" referred to KU or to the State of Kansas. Furthermore, defendants urge that the jury was presented with various third-party uses of the "Kansas" mark. Thus, the jury could have found that "Kansas" is a relatively weak mark, outweighing relative similarities between the marks.

◼ The Court declines to change its summary judgment ruling that the five one-sided "Kansas" shirts are infringing as a matter of law. Defendants made similar arguments about the strength of the "Kansas" mark on summary judgment and the Court explicitly found that the similarities between the defendants' one-sided "Kansas" shirts and officially licensed T-shirts are overwhelming. Further, the Court found that "[t]he high degree of similarity weighs strongly in favor of a finding of intent; the use of almost identical marks supports a conclusion that defendants intended to derive a benefit from KU's reputation, rather than rely upon their own." [41]

◼ To the extent plaintiffs renew their motion for reconsideration of the Court's denial of summary judgment on the two-sided T-shirts containing the "Kansas" mark, the motion is denied. For the same reasons discussed at length in its Order denying motion for reconsideration, the Court finds that a reasonable jury could find no likelihood of confusion with regard to defendants' use of the "Kansas" mark when non-infringing language appears on the back of the T-shirt. A reasonable jury could conclude that such language is dissimilar on the levels of sight, sound, and meaning and that this weighs against a finding of likelihood of confusion and does not create a presumption of intent to infringe. Plaintiffs are unable to meet their heavy burden on a Rule 50 motion, as the moving party who also bears the burden of proof at trial, that the only reasonable conclusion the jury could reach is that these shirts are infringing.

◼ Plaintiffs further contend that judgment is appropriate because the jury's decisions on certain T-shirts are inconsistent. The Court disagrees with plaintiffs that there was "overwhelming evidence" presented at trial that could lead to no other conclusion but that all or none of these T-shirts are infringing. The jury determined that the "Kansas Swim Team" T-Shirt [42] was infringing while the "Kansas Drinking Team" [43] and "Kansas Co-Ed Naked Beer Pong" [44] shirts were not. Defendants made a myriad of distinctions between KU's use of the "Kansas" mark on apparel and defendants' use of the mark on T-shirts and urged the jury to consider each T-shirt separately. Given the plethora of factors that the jury could consider when determining whether a likelihood of confusion existed—an inquiry

**41.** (Doc. 228 at 40.) In *Board of Supervisors for La. State Univ. Ag. & Mech. Coll. v. Smack Apparel Co.,* the Fifth Circuit affirmed the district court's grant of summary judgment for plaintiffs based primarily on the "overwhelming similarity of the marks and the defendant's intent to profit from the Universities' reputation." 550 F.3d 465, 483 (5th Cir.2008). In reaching this decision, the Fifth Circuit considered each of the six T-shirts alleged to be infringing and compared them to officially licensed products by the plaintiff Universities. *Id.* at 479–81.

**42.** (Pl. Trial Ex. 182.)

**43.** (Pl. Trial Ex. 183.)

**44.** (Pl. Trial Ex. 189.)

that was conducted separately for each alleged infringing use—this Court is not in a position to conclude that the evidence, when tested for overwhelming effect, could only support a verdict in plaintiffs' favor.[45]

## 2. "Hawk" and "Hawks" T–Shirts

Plaintiffs urge that judgment on the infringement and dilution claims should be entered in their favor on the T-shirts displaying the words "Hawk" or "Hawks." Plaintiffs argue that defendants' trial testimony that they intentionally used "Hawk" or "Hawks" in order to reference KU created a presumption of infringement that defendants failed to rebut. Also, plaintiffs again point to alleged inconsistencies within the jury's verdict since the jury determined that some T-shirts containing these terms were infringing and diluting, while others were not.

■ Plaintiffs first contend that "Hawk(s)" is undisputedly short for plaintiffs' "Jayhawk(s)" mark, pointing to defendants' trial testimony where they admitted as much. Plaintiffs refer to defendant Sinks' testimony where he admits that his use of the phrase "Hawk Football" was to reference the University of Kansas.[46] Sinks also testified that he intended to appeal to KU fans by placing "Hawk Basketball" on a blue shirt since blue is one of KU's school colors. In fact, Sinks testified "I used the word 'Hawk' to reference it, yes. But it does not include any of their trademarks." Later, plaintiffs' counsel asked, "Did there come a time you intentionally used that language because you recognized it as short for 'Jayhawk Basketball'?" Sinks responded, "No. I designed it just to specifically reference 'Hawk Basketball,' which was a reference to the University of Kansas Basketball."[47] The Court finds that this testimony falls short of conclusive evidence of an intent to infringe on the "Jayhawk" mark such that judgment is appropriate with regard to those T-shirts. While plaintiffs are correct that it is evidence of intent, the jury could have just as reasonably concluded that defendants used the term "Hawk(s)" to specifically avoid infringing on the "Jayhawk" mark.

■ Next, plaintiffs appear to argue that Instruction No. 31 was given in error. It stated:

A potential infringer cannot avoid confusion simply by adding a word or phrase to the mark. Thus, you may still find a likelihood of confusion even if defendants have added words, phrases, or a logo to their T-shirts.

Furthermore, for purposes of the likelihood of confusion analysis, you may not shorten a trademark when evaluating the similarity of the marks.[48]

---

**45.** *See, e.g., Sally Beauty Co. v. Beautyco, Inc.,* 304 F.3d 964, 972 (10th Cir.2002) (citations omitted) (explaining that the likelihood of confusion factors are nonexhaustive and that no one factor is dispositive). Without concluding one way or another what the jury relied upon in distinguishing these shirts, the Court notes that one obvious distinction between these shirts is the presence of the Joe-College.com logo on the two shirts that the jury found to be noninfringing and lack of that logo on the "Kansas Swim Team" shirt that it found was infringing. Also, the "Kansas Swim Team" shirt involved a sexual reference, while the other shirts were drinking references. Finally, the "Kansas Swim Team" T-shirt references a real team, (Doc. 353 at 48), while the other two describe fictional, nonexistent teams. *See Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 852 (10th Cir.2000) (explaining that when evaluating whether the jury verdict is inconsistent, the Court must "accept any reasonable view of the case that makes the jury's answers consistent.").

**46.** *See* Doc. 335 at 125.

**47.** *Id.* at 126.

**48.** (Doc. 330, No. 31.)

In fact, plaintiffs did not object to this instruction.[49] In their Rule 50(b) motion, plaintiffs state that the instruction "may have confused the jury into believing that a shortened version of a trademark cannot cause confusion." Of course, the instruction does not state that the jury may not find infringement when the mark is shortened; it merely instructs that for the similarity of the marks factor, the jury may not shorten a trademark.

Aside from Mr. Tilley's closing argument, plaintiffs point to no evidence showing that the jury misunderstood this instruction.[50] Given the presumption that a jury follows a trial court's instructions,[51] the Court finds that Instruction No. 31 was sufficient to cure any error arising out of Mr. Tilley's closing argument that shortening the trademark cannot result in trademark infringement.[52]

 Plaintiffs are left to rely upon alleged inconsistencies in the T-shirts that the jury found infringing or diluting, but fail to explain how these alleged inconsistencies are evidence that the jury failed to follow the Court's instruction. Again, plaintiffs suggest that the only reasonable verdict was for the jury to find all or none of the "Hawk(s)" T-shirts to be infringing. Of course, each of the T-shirts that plaintiffs highlight in their brief are different. The only "Hawk(s)" T-shirts that the jury found to be infringing include other marks that plaintiffs alleged were infringed upon.[53] Again, the jury was properly instructed to consider a whole host of factors in reaching separate verdicts for each T-shirt at issue. The Court is unable to determine that the jury's conclusions are inconsistent given that they made separate determinations for each T-shirt, in line with the Court's instructions. It is reasonable for the jury to have determined that defendants' use of "Hawk(s)" was not infringing unless it was used in conjunction with certain other marks affiliated with KU; therefore, the Court is unable to find the verdict to be inconsistent.[54]

### 3. Crimson–and–Blue Color Scheme

 Plaintiffs argue in their Rule 50(b) motion that under the "doctrine of legal equivalents,"[55] the crimson-and-blue

---

**49.** (Doc. 358 at 6) ("I wouldn't object to a properly-worded sentence that follows that basically leaves it up to the jury in the sense that it says shortening a trademark of the plaintiff doesn't necessarily constitute infringement. Or something to that effect. Or it says that you take that into consideration."); *see also id.* at 7 (plaintiffs' counsel agreeing to the Court's proposed language).

**50.** "And even though Mr. Henn made every effort to get Mr. Sinks to admit that it's shorthand for 'Jayhawk,' that simply is not a relevant issue for purposes of your determination whether or not there's any confusion in this case.'" (Doc. 344 at 13.)

**51.** *Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000); *Battenfield v. Gibson,* 236 F.3d 1215, 1225 (10th Cir.2001).

**52.** The Court does not make a finding with regard to the propriety of Mr. Tilley's statement but notes that just before making this statement, he discussed how the jury is not to shorten a trademark when evaluating the similarity of the marks factor in its likelihood of confusion analysis. (Doc. 344 at 13.)

**53.** *See, e.g.,* Ex. 243 (including "Phog" mark); Ex. 263 (including "Kivisto Field" mark); and Ex. 285 (including "Kansas" mark).

**54.** *See Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 852 (10th Cir.2000) (explaining that when evaluating whether the jury verdict is inconsistent, the Court must "accept any reasonable view of the case that makes the jury's answers consistent.").

**55.** This is also referred to as the "doctrine of picture-word equivalency," which states that when "a picture mark and a word mark that describes the picture (such as a picture of a moose and the word 'moose'), may leave customers with a similar mental impression, a fact finder could determine that the two types

color scheme must be deemed infringing because the jury found that defendants' use of the words "crimson and blue" were infringing. The Court does not find support for the proposition that this doctrine dictates a finding by the jury that both the crimson-and-blue color scheme and the words "crimson and blue" are equivalent as a matter of law.[56] Moreover, the jury was required, as a matter of law, to evaluate the similarity of the marks "in the context of the marks as a whole as they are encountered by consumers in the marketplace."[57] The jury could have easily determined that the words "crimson and blue," in the context in which they appeared, created a likelihood of confusion, while T-shirts that did not otherwise cause a likelihood of confusion failed to become infringing solely because the non-infringing words appeared on a crimson or blue T-shirt.

▆▆▆ Finally, plaintiffs argue that defendants' testimony proves intent to copy the plaintiffs' color marks and thus, a presumption of infringement applies. While "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion,"[58] "mere knowledge should not foreclose further inquiry."[59] But, unlike at the summary judgment stage, the evidence must be so one-sided that the only reasonable conclusion, without weighing the credibility of the witnesses, is in plaintiffs' favor. While there is certainly evidence in the form of Sinks' and Orth's testimony that they printed their T-shirt designs on blue T-shirts in order to appeal to KU fans and reference KU, the jury could also reasonably conclude that this testimony only supports the conclusion that Sinks and Orth merely had knowledge of KU's marks. Moreover, the jury could have reasonably weighed other likelihood of confusion factors more heavily than the intent factor.[60] Accordingly, the Court is unable to conclude that the only reasonable verdict is that defendants infringed on the crimson-and-blue color scheme with regard to each of defendants' T-shirts that use these colors.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Judgment as a Matter of Law on Defendant Orth's Mere Printer Defense (Doc. 325) is **denied as moot;** plaintiffs' Motion for Judgment as a Matter of Law on the Secondary Meaning of the Crimson–and–Blue Color Scheme and the Inherent Distinctiveness of Plaintiffs' Word Marks

---

of marks are confusingly similar." *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F.Supp.2d 1214, 1228–29 (C.D.Cal.2004), *aff'd,* 114 Fed.Appx. 921 (9th Cir.2004). The Court notes that plaintiffs did not request an instruction on this issue.

**56.** *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257 (2d Cir.1987) ("we agree that words and pictorial representations should not be equated as a matter of law, a district court may make such a determination as a factual matter.").

**57.** *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir.1999) (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir.1986)).

**58.** *Universal Money Ctrs., Inc. v. AT & T*, 22 F.3d 1527, 1531 (10th Cir.1994).

**59.** *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.1990).

**60.** *See Board of Supervisors for La. State Univ. Ag. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 482 (5th Cir.2008) ("Smack's admitted intent *and* the similarity in appearance between Smack's shirts and the Universities' licensed products is strong evidence of a likelihood of confusion." (emphasis added)). The Court notes that *Smack* involved only six T-shirts, all of which bore strong similarities to specific licensed apparel. *See id.* at 479–81. Furthermore, the Fifth Circuit was reviewing under a summary judgment standard, not the

(Doc. 323) is **denied;** defendants' oral Motion for Judgment as a Matter of Law is **denied;** and plaintiffs' Motion for Renewed Judgment as a Matter of Law (Doc. 345) is **granted in part and denied in part.** The Court directs the clerk to enter judgment on the verdict except with regard to the following T–Shirts on pages 6, 7, and 93 of the Verdict Form: Exhibits 77, 78, 125, 126, and 416 at pp. 78. As to those T–Shirts, judgment is entered for plaintiffs; defendants are prohibited from the sale of those T-shirts in accordance with the Court's July 21, 2008 Order (Doc. 333).

**IT IS SO ORDERED.**

### *MEMORANDUM AND ORDER*

The Court now considers various post-trial motions filed by the parties since Judgment was entered in this matter. After a trial, the jury returned a verdict in favor of plaintiffs on all claims. The jury further found all three defendants liable on each of the six claims.[1] On December 1, 2008, the Court entered a Memorandum and Order denying plaintiffs' motion for judgment under Fed.R.Civ.P. 50(a) and granting in part and denying in part their motion for judgment under Rule 50(b) and denying defendants' motion for judgment under Rule 50(a). Judgment was then entered:

> this judgment incorporates the verdict entered in this matter except with regard to the following T–Shirts on pages 6, 7, and 93 of the Verdict Form: Exhibits 77, 78, 125, 126 and 416 at pp. 78. As

to those T–Shirts, judgment is entered for plaintiffs. This judgment also incorporates the injunctive relief set forth in Doc. 333.[2]

Defendants have since filed: (1) Motion for Judgment as a Matter of Law (Doc. 364); and (2) Motion to Alter Judgment (Doc. 365). Plaintiffs have filed: (1) Motion for Contempt Sanctions and Seizure Order; and (2) Motion to Amend/Correct Order of Permanent Injunction (Doc. 396).[3] These motions are fully briefed and the Court is prepared to rule. As explained below, the Court denies defendants' motions for judgment as a matter of law and to alter or amend, denies plaintiffs' motion for contempt, and grants plaintiffs' motion to amend the order of permanent injunction.

### I. Defendants' Motion for Judgment as a Matter of Law

Defendants renew their motion for judgment as a matter of law under Rule 50(b) on the sufficiency of evidence for plaintiffs' trademark dilution claims. "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position."[4] The Court must consider the evidence admitted at trial, construing it and the inferences from it in the light most favorable to the non-moving party.[5] The Court may not make credibility determinations or weigh the evidence.[6]

---

heightened standard applicable here. *See id.* at 474–75.

**1.** The jury made separate findings on the trademark infringement/unfair competition claims and the trademark dilution claims with regard to each of the 206 T-shirt designs at issue in the case. (Doc. 332.)

**2.** (Doc. 363.)

**3.** The Court will address plaintiffs' Motion for Attorney Fees and Expenses (Doc. 372) in a separate order.

**4.** *Tyler v. RE/MAX Mountain States, Inc.,* 232 F.3d 808, 812 (10th Cir.2000).

**5.** *Id.*

**6.** *Id.*

Defendants contend that judgment is appropriate on the dilution claims for two reasons: (1) there was insufficient evidence of actual dilution on the eleven T-shirts that the jury found diluting; and (2) the evidence shows plaintiffs' marks have only achieved "niche fame," and not the widespread fame required to sustain a dilution claim. As an initial matter, the Court notes that this latter argument was not raised in defendants' Rule 50(a) motion, which only addressed whether there was sufficient evidence of actual dilution. A renewed motion under Rule 50(b) "cannot assert grounds for relief not asserted in the original motion." [7] However, plaintiffs do not discuss this issue in their response memorandum, resulting in waiver, so the Court will address defendants' niche fame argument.[8]

### A. Actual Dilution

■■■ Plaintiffs must show actual dilution under the Trademark Dilution Revision Act ("TDRA") of 2006 in order to recover monetary damages.[9] The marks utilized on the T-shirts found to be diluting by the jury are: "Kansas," [10] "Phog," [11] "Jayhawk," [12] and "Crimson and Blue." [13] All of the T-shirt designs found to be diluting were printed on blue or red T-shirts. In denying defendants' motion un-

der Rule 50(a), the Court pointed to Jim Marchiony's testimony about being approached by anonymous KU fans complaining about the negative effect that defendants' T-shirts have on the University's reputation, and to web blog entries in the *Lawrence Journal World* that show that certain people in the Lawrence, Kansas community believed the T-shirts to be offensive. Defendants ask the Court to reconsider because none of this evidence pertained to the specific T-shirts that the jury found to be diluting.

Dilution by blurring "is association rising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." [14] Dilution by tarnishment is "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." [15] Under the tarnishment theory, plaintiffs must show that the KU marks will "suffer negative associations" through defendants' use.[16] "Some cases have found that a mark is tarnished when its likeness is placed in the context of sexual activity, obscenity, or illegal activity." [17]

The Court declines to change its ruling that the Marchiony testimony could allow a reasonable jury to conclude that the

---

**7.** *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 738 (10th Cir.2007).

**8.** *See id.* at 739.

**9.** 15 U.S.C. § 1125(c)(5); *see adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F.Supp.2d 1029, 1061–62 (D.Or.2008).

**10.** (Doc. 332 at 9, Exs. 132, 133; 14, Ex. 142; 18, Ex. 151; 28, Ex. 173; 29, Exs. 177, 178; 31, Ex. 182.)

**11.** (Doc. 332 at 53, Ex. 233.)

**12.** (Doc. 332 at 71, Ex. 281.)

**13.** (Doc. 332 at 87, Ex. 313.) The jury also answered "Yes" to Question 7 that asked:

"Do you find actual confusion with regard to the trademark infringement and unfair competition claims and/or do you find actual dilution with regard to the dilution claims?"

**14.** *Id.* § 1125(c)(2)(B).

**15.** 15 U.S.C. § 1125(c)(2)(C).

**16.** *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir.1996); *Sony Computer Enter., Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir.2000).

**17.** *Hormel Foods Corp.*, 73 F.3d at 507 (collecting cases).

defendants' use of the "Kansas," "Phog," "Jayhawk," and "Crimson and Blue" marks caused actual dilution as described above. It is of no moment that Marchiony failed to identify the specific shirts that fans and alumni complained to him about. Defendants are correct, Marchiony's testimony is that fans complained about "those shirts," in the plural. Marchiony testified that "it happens a handful of times at every home event that I attend. Mostly football games—home football games—and home basketball games. Which is, again, our—our most highly attended events." [18] When construing this evidence in the light most favorable to plaintiffs, Marchiony's testimony is direct evidence that KU fans find many of defendants' shirts offensive or inappropriate and, notably, believed that KU could "do something about it." A reasonable jury could infer that these fans believed that defendants' irreverent T-shirts impaired the distinctiveness of plaintiffs' marks.

Moreover, the jury could have concluded that defendants' use of the marks constituted actual dilution through tarnishment based on a review of the T-shirts alone in concert with Marchiony's testimony. Every T-shirt that the jury found to be diluting involved placing plaintiffs' mark or marks in the context of sexual activity or obscenity. Marchiony testified that fans complained to him about defendants' T-shirts at home football and basketball games and asked if the University could do anything about it. This is evidence, upon which a reasonable jury could rely, that defendants' use of the University of Kansas ("KU") marks impaired the identification of its marks with its own licensed merchandise. Therefore, the Court is unable to conclude that the evidence is not susceptible to reasonable inferences that may support a finding of actual dilution.

### B. Fame

■ Next, defendants argue that there was no evidence at trial that plaintiffs' marks enjoy widespread fame sufficient to support a finding of liability on the dilution claims. Defendants point to the language in the TDRA requiring the mark to be "widely recognized by the general consuming public of the United States." [19]

Defendants rely entirely upon the analysis set forth in *Bd. of Regents, the University of Texas System v. KST Electric, Ltd.*,[20] which adopted the Magistrate Judge's recommendation to grant summary judgment in favor of the defendant because the evidence failed to show that the University of Texas's ("UT") logo achieved widespread fame, as opposed to "niche fame." [21] The mark at issue was the "longhorn silhouette logo." The court rejected the plaintiff's circumstantial evidence of fame[22] because it all related to

---

18. (Doc. 356 at 101.)

19. 15 U.S.C. § 1125(c)(2)(A).

20. 550 F.Supp.2d 657, 679 (W.D.Tex.2008).

21. Plaintiffs suggest that the district court only adopted the report and recommendation of the Magistrate Judge because the plaintiffs "gave the district court their express permission." To be sure, the district court's order explains that the plaintiffs chose not to file an objection to the report and recommendation but instead filed a "response," setting forth their disagreement with the Magistrate Judge's recommendation on the niche fame issue. The district court found no plain error in the Magistrate Judge's report and recommendation and adopted it, notwithstanding the plaintiffs' "response." *Id.* at 662.

22. This evidence included that UT football and men's basketball games were nationally televised on a regular basis, that UT beat University of Southern California in the Rose Bowl national championship game in the highest rated college football game since 1987, that UT football players appear on *Sports Illustrated,* that the UT helmet was displayed on two separate Wheaties' boxes, and that UT earns record royalties and has

the use of the logo at or concerning sporting events.[23] The Court explained that such evidence "hardly equals presence with the general consuming public (nearly the entire population of the United States). Simply because UT athletics have achieved a level of national prominence does not necessarily mean that the longhorn logo is so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK."[24]

Defendants argue that plaintiffs relied entirely on the national prominence of KU's athletic programs in attempting to establish fame. Defendants contend that because the fame is only associated with athletics, as in *University of Texas*, they can only establish "niche fame," which is no longer acceptable under the TDRA.[25]

The Court finds that plaintiffs submitted sufficient evidence of national fame in order to satisfy the current incarnation of the TDRA. First, the Court agrees with plaintiffs that the *University of Texas* decision does not stand for the proposition that no collegiate mascot nor word mark may enjoy national fame. Instead, that decision, in the posture of summary judgment, simply found that UT failed to present evidence of its logo outside the context of sporting events. Here, plaintiffs submitted an abundance of evidence on the use of the various marks both within and outside the context of sporting events. In addition to national media coverage and exposure of the athletic teams, plaintiff submitted evidence that KU has been re-

ferred to as "Kansas" since the 1930s and that KU has used the crimson and blue color scheme and the Jayhawk mascot for over 100 years.

Furthermore, Paul Vander Tuig testified that "the Phog" has been used in media guides since 1988. He further testified that it has been used on licensed apparel since at least the early 1990s when he began working at KU. Vander Tuig also testified about "Rock Chalk Jayhawk."[26] He explained that the phrase was first used by students in the 1880s and has been used for years at KU events as well as on licensed KU products since at least as early as he has worked for KU. When viewed in the light most favorable to plaintiffs, this evidence, along with evidence of advertising, unsolicited media references, brochures about the University, and substantial sales of KU's licensed merchandise displaying the marks, supports the jury's finding of national fame. Likewise, defendants' evidence of third-party use of the marks does not require judgment in their favor as a matter of law. While the jury could certainly consider this evidence in making a determination of fame on the dilution claims, it was not required to weigh it more heavily than plaintiffs' evidence of fame. Under the standard this Court must apply on a motion for judgment as a matter of law, there was sufficient evidence upon which the jury could have found fame despite the evidence of third-party use.

made millions in retail sales from UT licensed products. *Id.* at 677–78.

**23.** *Id.* at 678.

**24.** *Id.*

**25.** *See, e.g., Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,* 212 F.3d 157,

164 (3d Cir.2000) (explaining mark entitled to protection even if it is not famous to the general public if it enjoys a high degree of fame in a niche market, under the pre–2006 Act).

**26.** (*See* Pl. Trial Ex. 73.)

## II. Defendants' Motion to Alter or Amend, for Remittitur, and Alternative Motion for New Trial; Plaintiffs' Motion for Seizure Order and Civil Contempt Sanctions

### A. Profits Award

 Defendants seek a reduction in the amount of profits awarded by the jury in this matter, $119,087.00, arguing it is excessive. Alternatively, they seek a new trial. Defendants specifically urge the Court to rely upon Defendants' Trial Exhibit 651, a summary of sales for specific T-shirts by Joe–College.com prepared by defendant Larry Sinks and admitted at trial and find that the profits award should be reduced to $29,946.85. Defendants maintain that the jury's profits award was erroneous, as it did not credit this evidence.

Under Rule 59, "[a]bsent an award that shocks the judicial conscience or raises an irresistible inference that passion, prejudice, corruption or other improper cause played a part in the jury's damage award," the Court should not disturb the jury's damage award.[27] But under 15 U.S.C. § 1117(a), "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."

The Court is unable to find that the jury's profits award is excessive given the evidence presented at trial. The jury was essentially presented with competing evidence of profits made by the Joe–College store during the period in question. Defendant Sinks testified about calculations that he reached, based on his own representations of the numbers of T-shirts sold, his expenses, and net profits. According to Sinks, the business realized a net profit on all allegedly infringing T-shirts in the amount of $141,446.02.[28]

There was substantial evidence, however, upon which a reasonable jury could conclude that little if no weight should be given to this evidence. Plaintiffs' accounting expert, Ian Ratner, testified that the information provided by Sinks in Ex. 651 was not reliable because it was not supported by underlying documentation.[29] Sinks admitted at trial that he lacked the "backup documentation" for the figures provided in Ex. 651. He testified that he compiled the list of sales by specific T-shirt about one month prior to trial by looking back through old invoices and trying to recreate how many shirts he sold and that the list represented his best guesses on these amounts. Sinks admitted that the list was compiled in part based on his own memory and that he has no tracking system or accounting software that would show how many of each T-shirt design had in fact been sold and the actual profits for each T-shirt. By contrast, Ratner reached a lost profits estimate based on subpoenaed bank records, invoices, and other underlying documents provided by defendants during discovery. Ratner relied on invoices for about an eight-month

---

27. *Woolard v. JLG Indus., Inc.*, 210 F.3d 1158, 1173–74 (10th Cir.2000) (internal citation omitted); *see also Cook v. Med. Savings Ins. Co.*, 287 Fed.Appx. 657, 667 (10th Cir. 2008).

28. *See* Defs. Trial Ex. 653A.

29. "I just don't think that you can rely on, you know, a typed list like this. There's no support for the unit sales and how you divide the units between infringing and noninfringing. Just there's no way to audit this." (Doc. 387 at 42.) When asked which number would be more reliable, his own or defendant Sinks', he responded, "The 512. It's based on data that you could verify, ratios that you could verify. I think the 512 is a much better number." *Id.* at 84.

period of sales. Ratner also testified that defendants failed to disclose underlying data to him that would normally be expected to be kept in the ordinary course of business by businesses such as Victory Sportswear and Joe–College.com.

Ratner calculated a range of profits received by defendants for allegedly infringing T-shirt sales. On the low end, he calculated approximately $343,000 in total gross sales for JoeCollege.com and at the high end, approximately $512,000.[30] The low end represented the amount of sales provided by Sinks, while the high end represented the numbers Ratner was able to verify by using bank statements and invoices. He determined a profit margin of 55% by comparing the purchase price on the T-shirts from Victory Sportswear and the sales price. With regard to Victory Sportswear, Ratner found a total gross sales range of approximately $241,000 to $2 million. Ratner was unable to determine a profit margin for Victory Sportswear because he was not provided with sufficient information, requested repeatedly by plaintiffs during discovery, to render such a calculation. Defendant Orth did not disclose during discovery any evidence on the costs and deductions for the business, nor did he disclose any other financial information, despite repeated attempts by plaintiffs to obtain such information.

Ratner further testified that defendants' cost calculations were erroneous. He explained that costs such as rent and payroll are fixed, rather than variable, and that under basic accounting principles, these items should not be incremental to the sales of infringing products because they would have been incurred even if defendants had not produced and sold the infringing products. Therefore, those items should not be deducted from the gross sales numbers in order to determine profit.[31] Moreover, there was no data produced at all by defendant Orth concerning his expenses prior to trial. Nor did defendants produce evidence of their costs aside from defendants' own testimony. Defendants did not make a showing that certain fixed items were actually related to the sale of the infringing products, which of course was their burden to prove.[32] Given the lack of data to support these figures, the jury could have rejected defendants' profit estimates, or could have found their testimony entirely lacked credibility. It is not this Court's function to weigh the credibility of witnesses.

Given the evidence presented at trial, as set forth above, the Court is unable to conclude that the jury's award of profits was excessive. The jury awarded the amount sought by plaintiffs, proportional to the percentage of T-shirts they found to be the subject of liability. This figure was reached by plaintiffs' expert—the only accounting expert who testified about damages—and was based on verifiable data, despite the defendants failure to produce specific data with regard to each T-shirt during discovery. Given the circumstances of this case, the Court finds that the jury's profits award is just and is not excessive. Therefore, neither remittitur nor a new trial is appropriate.

---

**30.** Ratner figured that the ratio of infringing to non-infringing sales was about 68% based on the amounts sold during the eight months' worth of invoices he reviewed. He applied that ratio to the total amount of sales he was able to verify with the bank records to determine profit.

**31.** (Doc. 387 at 45–46.)

**32.** *See* 15 U.S.C. § 1117(a); *Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 177 (3d Cir. 2005); *Abbott Labs. v. Unlimited Beverages, Inc.,* 218 F.3d 1238, 1242 (11th Cir.2000); *Nike, Inc. v. Variety Wholesalers, Inc.,* 274 F.Supp.2d 1352, 1373 (S.D.Ga.2003), *aff'd,* 107 Fed.Appx. 183 (11th Cir.2004).

## B. Defendants' Claim that Certain T–Shirts were Erroneously Included in the Judgment

■ This argument is the subject of defendants' motion to alter or amend the judgment and of plaintiffs' motion for seizure and contempt sanctions. In its March 19, 2008 Memorandum and Order, this Court granted plaintiffs' motion for summary judgment on four specific shirts containing plaintiffs' marks.[33] The Court found that those T-shirts displayed marks that are overwhelmingly similar to KU's marks and that the striking similarities trigger a presumption that defendants intended to infringe. The Court found that the "Kansas" mark was protectable as a matter of law because it is incontestable and found infringing two one-sided T-shirts, one crimson and one blue, that bear the "Kansas" mark with no other differentiating marks. Inexplicably, the parties proceeded to submit these shirts, found to be infringing as a matter of law, to the jury. The jury found these two shirts not to be infringing. Immediately following the trial, the Court entered an injunction, which was not opposed by defendants, "prohibiting the sale of those shirts found to be infringing or diluting by the jury." [34]

In its December 1, 2008 Memorandum and Order ruling on plaintiffs' post-trial motions, the Court declined to revisit its summary judgment ruling despite the fact that the parties had opted to submit these T-shirt designs to the jury for consideration. It also clarified its summary judgment ruling,

> In its summary judgment order, the Court stated: "in their statement of uncontroverted facts, plaintiffs refer to these as 'examples.' While the Court is unable to locate other instances like these in its cursory review of the exhibits, its findings with regard to these shirts apply to any other shirts that similarly include KU's marks without any other differentiating marks or additional non-infringing language. It is incumbent upon plaintiffs to identify any such additional shirt designs." In their renewed motion, plaintiffs identify three other T-shirts that were included on the verdict form: Trial Exhibits 77, 125, and 416 at 78 (Doc. 332 at 6, 93). The Court agrees that these shirts are included in the Court's summary judgment ruling for plaintiffs.[35]

The Court entered judgment for plaintiffs on the T-shirt designs found to be infringing or diluting by the jury, those identified in the summary judgment order, and the additional T-shirt designs specifically referred to above that were identified in plaintiffs' renewed motion for judgment, despite the fact that the jury found some of these designs to be non-infringing.

■ Defendants seek reconsideration of the Court's decision to enter judgment on those T-shirt designs not explicitly identified in the summary judgment order. A motion to alter or amend judgment pursuant to Rule 59(e) may be granted only if the moving party can establish: (1) an intervening change in the controlling law; (2) the availability of new evidence that could not have been obtained previously through the exercise of due diligence; or (3) the need to correct clear error or prevent manifest injustice.[36] Such a motion does not permit a losing party to rehash arguments previously addressed or to present new legal theories

---

**33.** Specifically, the Court granted summary judgment on the shirts presented in Doc. 144, Ex. A at 1–3, 85.

**34.** (Doc. 333.)

**35.** (Doc. 362 at 12–13 n. 38.)

**36.** *Brumark Corp. v. Samson Res. Corp.,* 57 F.3d 941, 948 (10th Cir.1995).

or facts that could have been raised earlier.[37]

Defendants argue that the additional T-shirts identified by plaintiffs in their renewed motion for judgment are not "examples" of the "Kansas" T-shirts found to be infringing as a matter of law on summary judgment because they are not printed on crimson or blue shirts. But this Court's summary judgment order did not hinge on the fact that the "Kansas" shirts were printed on red and blue T-shirts. The Court found that the shirts bear KU's colors and have similar block lettering as those that are officially licensed.[38] The Court further found that

> no reasonable jury could conclude that the *lettering* is not substantially similar. The Court considered the overall appearance of the T-shirts, as they appear to the consuming public and found that consumers, encountering these T-shirts in the marketplace, would not be able to identify the subtle difference in font and associate this difference with whether the products are licensed or not.[39]

Also, in denying summary judgment on the two-sided "Kansas" shirts, the Court heavily relied on evidence that the language on the back of each shirt created important differences in the overall presentation of the marks to consumers given that such references are neither condoned by KU nor used on officially licensed products. The T-shirts in Exhibits 125, 77, and 416 at 78 are all one-sided "Kansas" T-shirts with no differentiating language. They bear almost identical lettering to officially licensed products and in some cases bear the school colors of crimson or blue on either the T-shirt or the lettering. The Court's Judgment was not in error, but was instead an extension of its earlier ruling.

Defendants also suggest that this Court explicitly found non-infringing on summary judgment the T-shirts identified by plaintiffs in their renewed motion for judgment. The plain language of the Court's summary judgment order belies this contention. The Court explicitly found on summary judgment that, to the extent the four T-shirt designs identified in the summary judgment order were "examples" of KU marks that do not contain any other differentiating marks, the ruling equally applied to similar T-shirt designs that plaintiffs were able to identify. Because plaintiffs identified these items in their renewed motion for judgment, the Court added them to the Judgment as infringing T-shirt designs. This finding was not clear error; therefore, defendants' motion to alter or amend the judgment is denied.

Defendants' counsel represents in his response to plaintiffs' motion for seizure and sanctions that he did not immediately recognize that the Judgment in this matter encompassed additional T-shirts, in particular, those that are not printed on crimson and blue T-shirts. He asserts that because the Judgment stated that it "incorporates the injunctive relief set forth in Doc. 333," which was immediately entered after the verdict, he was not enjoined from selling T-shirts other than those found to be infringing or diluting by the jury. Singling out one line from this Court's twenty-page December 1, 2008 Memorandum and Order,[40] and apparently skipping over

---

**37.** *Brown v. Presbyterian Healthcare Servs.,* 101 F.3d 1324, 1332 (10th Cir.1996), *cert. denied,* 520 U.S. 1181, 117 S.Ct. 1461, 137 L.Ed.2d 564 (1997).

**38.** *See King of the Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1090–91 (10th Cir.1999) (comparing colors and lettering of marks).

**39.** (Doc. 362 at 35 (emphasis added).)

**40.** Counsel repeatedly refers to this Court's statement that it "declines to change its summary judgment ruling." Of course, the Court made this statement in the context of rejecting defendants' contention that the jury's verdict overrode this Court's findings on summary judgment with regard to the specific T-

explicit exhibit references in the Judgment itself, counsel contends that he believed the Judgment only amended the verdict with regard to those one-sided T-shirts explicitly identified in the Court's summary judgment order. Counsel represents that he attempted to contact counsel for plaintiffs on December 8, 2008 to provide him with copies of the exhibits referenced in the Judgment but that they did not respond to this request for assistance. Thus, counsel did not advise his client to stop selling the additional shirts included in the Judgment, believing these additional references to be in error, until he received the motion for sanctions on December 16, 2008. Therefore, there was a two-week period of time during which the Joe–College store sold certain infringing T-shirt designs.

■■■ Plaintiffs seek the following relief: (1) that the Court authorize seizure of any shirts violating this Court's Permanent Injunction and Judgment; and (2) impose compensatory and coercive contempt sanctions in the form of a reasonable royalty, profits, a trebling of profits and/or a fine, and the reasonable attorneys' fees and costs associated with bringing this motion. Plaintiffs must show by clear and convincing evidence that (1) a valid court order existed; (2) defendants had knowledge of the order; and (3) defendants disobeyed the order.[41] There is no question that defendants had knowledge of a court order—the permanent injunction and the Judgment. There is some question about the extent of defendants' knowledge of the orders and whether they disobeyed them.

While the Court finds it strange that counsel and defendants apparently did not have the wherewithal to examine the exhibit references in the Judgment in order to ascertain exactly which T-shirts the Court was referring to,[42] it is apparent that defendants misunderstood the Court's Memorandum and Order ruling on the first round of post-trial motions, and the Judgment. The Court could have more clearly indicated in the Judgment that the injunction was to apply not only to those T-shirts found to be infringing or diluting on the verdict form, but also those found to be infringing by the Court as a matter of law, particularly since the Court granted plaintiffs' motion for judgment as a matter of law with regard to T-shirts not explicitly identified in the summary judgment order. According to Mr. Tilley's affidavit, he contacted counsel for plaintiffs and conveyed that he could not determine which T-shirts were pictured in the exhibits referred to in the Judgment. He asked counsel for plaintiffs for copies of the exhibits but they did not respond to this request. This is further evidence that Mr. Tilley, and by extension his client, did not have full knowledge of the extent of the Court's Order.

While the Court admonishes counsel for not reading the Court's Order and Judgment carefully, delaying advising his client accordingly, the Court cannot find by clear and convincing evidence that defendants had knowledge of an injunction prohibiting the sale of the additional shirts included in the Court's Judgment, yet disobeyed it. Within two weeks of the Court's Judg-

---

shirts identified in the summary judgment order. The Court fails to see how this statement is inconsistent with its further finding that additional T-shirts that plaintiffs identified in their motion are encompassed by the Court's summary judgment ruling.

**41.** *E.g., Phone Directories Co. v. Clark,* 209 Fed.Appx. 808, 813 (10th Cir.2006); *FTC v. Kuykendall,* 371 F.3d 745, 756 (10th Cir. 2004).

**42.** As plaintiffs correctly note, the verdict form is available electronically through PACER.

ment, once they became aware that the Judgment referenced additional one-sided "Kansas" T-shirts, defendants stopped selling the subject T-shirts. Given the history of compliance set forth in Mr. Tilley's affidavit, the Court is convinced that if they had understood the scope of the Judgment, they would have complied earlier. However, this Memorandum and Order should place defendants and their counsel on unambiguous notice of what is and is not covered by the injunction in this matter. As set forth in detail below, the Court is granting plaintiffs' Motion to Amend the Order of Permanent Injunction and will be entering an amended permanent injunction in line with their request. The Court will not tolerate noncompliance with this injunction and defendants will be held in contempt for future violations.

### III. Motion to Amend Order of Permanent Injunction

■ Plaintiffs ask the Court to modify the Order of Permanent Injunction, to prohibit defendants not only from selling infringing products, but also from manufacturing, distributing, advertising, marketing, promoting, displaying, or offering for sale any such T-shirts. Of course, the Court retains continuing jurisdiction to enforce and modify injunctions.[43] Given that defendants do not object to the relief sought so long as plaintiffs could demonstrate that the Court retains jurisdiction to modify its injunction, the Court grants plaintiffs' motion and will enter a modified injunction accordingly. The injunction will make clear that the prohibited conduct applies with regard to both the T-shirts found to be infringing by the jury as well by the Court.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Motion for Judgment as a Matter of Law (Doc. 364) and Motion to Alter Judgment (Doc. 365)

are **denied;** plaintiffs Motion for Contempt Sanctions and Seizure Order is **denied;** and plaintiffs' Motion to Amend/Correct Order of Permanent Injunction (Doc. 396) is **granted.**

Dated: *July 28, 2009.*

---

43. *See, e.g., Battle v. Anderson,* 708 F.2d 1523, 1539 (10th Cir.1983).